1  **COX, WOOTTON, GRIFFIN,**
   **HANSEN & POULOS, LLP**
2  Rupert P. Hansen (SBN 82302)
   Max L. Kelley (SBN 205943)
3  190 The Embarcadero
   San Francisco, CA 94105
4  Telephone No.: 415-438-4600
   Facsimile No.: 415-438-4601
5
   Attorneys for Plaintiff OCTAVIAN MARKA LLC
6

**FILED**

JUN 20 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7              UNITED STATES DISTRICT COURT
8              NORTHERN DISTRICT OF CALIFORNIA

9  OCTAVIAN MARKA LLC,            CV Case No. **13 2863**

10              Plaintiff,          )   **IN ADMIRALTY**
                                    )
11        v.                        )   **VERIFIED COMPLAINT** *SC*
                                    )
12  MARKA SHIPPING LTD.,** *in personam,* )
    and *M/T MARKA,* IMO no. 9512484, her )   **[F.R.C.P. RULE D and Local Admir.**
13  engines, tackle, gear, and appurtenances, *in* )   **R. 3]**
    *rem,*                          )
14                                  )
15              Defendants.         )
                                    )
16                                  )
                                    )
17  _____ )

18        COMES NOW, Plaintiff OCTAVIAN MARKA LLC ("Octavian") and for its

19  complaint against the above named defendants alleges as follows:

20              **JURISDICTION AND VENUE**

21        1.    This action is within the admiralty jurisdiction of this court pursuant to 28

22  U.S.C. § 1331 and 28 U.S.C. § 1333(1), and is an admiralty or maritime claim within the

23  meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

24        2.    Admiralty jurisdiction is based on the fact that Octavain entered into a

25  bareboat charter party, which is a maritime contract, with defendant MARKA SHIPPING

26  LTD. ("Marka Shipping") for the use of its vessel *M/T MARKA.* This is a possessory

27  action authorized by the Federal Rules of Civil Procedure, Supplemental Rules for

28  Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"), Rule

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO,
CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

HS.Varamo

-1-

VERIFIED COMPLAINT IN ADMIRALTY                                        Case No.

1    D. This Court also has the power to declare rights and liabilities pursuant to the Federal

2    Declaratory Judgment Act, 28 U.S.C. § 2201.

3         3.     Venue is proper in this Court because the *in rem* defendant vessel *M/T*

4    *MARKA* is physically located within the Northern District of California. Venue is also

5    proper in the United States District Court for the Northern District of California pursuant to

6    28 U.S.C. § 1391 (b)(2).

7                          **THE PARTIES**

8         4.     Plaintiff Octavian is a limited liability company formed under the laws of the

9    Marshall Islands and is the registered owner of the *in rem* defendant vessel *M/T MARKA*

10    (the "Vessel").

11        5.     *In rem* defendant M/T MARKA is a 230 meter oil/chemical tanker of

12    Maltese registry, IMO number 9512484. A true and correct copy of the Vessel's Malta

13    registry is attached hereto as **Exhibit 1.**

14        6.     Defendant Marka Shipping is the bareboat charterer of the OCTAVIAN

15    bareboat chartered the Vessel to defendant Marka Shipping pursuant to a Bareboat Charter

16    Agreement (Bareboat Charter) dated April 20, 2012. A true and correct copy of the

17    Bareboat Charter is attached hereto as **Exhibit 2.**

18                         **THE DISPUTE**

19        7.     Pursuant to Additional Clause 32(a) *(Hire)* of the Bareboat Charter, hire is to

20    be paid monthly in advance by defendant Marka Shipping to the account of the plaintiff

21    Octavian in the amount of US$13,000 per day on each monthly anniversary of the Delivery

22    Date.

23        8.     On May 28, 2013, a Hire Payment Date, US$403,000 was due and such

24    amount was not paid and has not been paid by defendant Marka Shipping to plaintiff

25    Octavian (the "May 2013 Payment Default"). In addition, certain hire that was required to

26    be paid on specific dates prior to May 28, 2013 was not paid when due and has not been

27    paid by defendant Marka Shipping to plaintiff Octavian as of the date of this Complaint (the

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO,
CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

HS. Varamo

-2-

VERIFIED COMPLAINT IN ADMIRALTY

*Case No.*

1    "Prior Payment Defaults" and collectively with the May 2013 Payment Default, the

2    "Payment Defaults"). As of June 19, 2013 the Payment Defaults were as follows:

| Invoice Date | Invoice Amount | Payment Date | Payment Amount | Outstanding Amount | Total Outstanding |
|---|---|---|---|---|---|
| 11/26/2012 | $390,000 | 1/16/2013 | $253,500 | $136,500 | $136,500 |
| 12/26/2012 | $403,000 | 1/16/2013 | $261,950 | $141,050 | $277,550 |
| 1/28/2013 | $403,000 | 1/16/2013 | $261,950 | $141,050 | $418,600 |
| 2/26/2013 | $364,000 | 2/26/2013 | $236,600 | $127,400 | $546,000 |
| 3/26/2013 | $403,000 | 3/26/2013 | $261,950 | $141,050 | $687,050 |
| 4/26/2013 | $390,000 | 4/26/2013 | $253,500 | $136,500 | $823,550 |
| 5/27/2013 | $403,000 | N/A | N/A | $403,000 | $1,226,550 |

9.     Pursuant to Additional Clause 39(a)(i) *(Non payment)* of the Bareboat Charter, failure to pay on the due date any amounts payable under the Bareboat Charter as and when due shall constitute a Termination Event if such non-payment is not due to an administrative or technical error and in that event is not remedied within three Business Days.

10.     Pursuant to Additional Clause 39(c) of the Bareboat Charter, at any time after a Termination Event shall have occurred and be continuing, plaintiff Octavian may, at its option and by notice in writing to the defendant Marka Shipping, terminate the Bareboat Charter with immediate effect or on the date specified in the Termination Notice and withdraw the Vessel from the service of defendant Marka Shipping, whereupon the Vessel shall no longer be in the possession of defendant Marka Shipping with the consent of plaintiff Octavian, and defendant Marka Shipping is required to redeliver the Vessel to plaintiff Octavian in accordance with Additional Clauses 34 and 35 of the Bareboat Charter.

11.     On Monday, June 17, 2013, Plaintiff Octavian LLC, sent defendant Marka Shipping a written Notice of Charter Termination and Demand for the Termination Payment and the Vessel ("Notice of Charter Termination and Demand"), noting that the Payment Defaults each constituted a Termination Event as defined under the Bareboat Charter. By the Notice of Charter Termination and Demand, Plaintiff Octavian terminated the Bareboat Charter effective immediately. A true and correct copy of said Notice of Charter Termination and Demand is attached to this complaint as **Exhibit 3**.

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO,
CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

HS.Varano

-3-

Case No.

VERIFIED COMPLAINT IN ADMIRALTY

1       12.    Additional Clause 39(f) of the Bareboat Charter, provides that on the

2 Termination Date in respect of any termination of the chartering of the Vessel under the

3 Bareboat Charter in accordance with Additional Clause 39(c) of the Bareboat Charter during

4 the Charter Period, defendant Marka Shipping shall pay to plaintiff Octavian an amount

5 equal to:

6       (A) all hire due and outstanding as at the Termination Date, including, for the

7 avoidance of doubt, Default Interest (as defined in paragraph 13 below); plus

8       (B) an amount equal to the Termination Payment Amount as defined in the

9 Bareboat Charter; plus

10       (C) any and all costs, including legal fees and expenses incurred in

11 connection with enforcing the Owners' rights related to the Termination Event(s).

12       13.    In addition, pursuant to Additional Clause 40 *(Interest on overdue amounts)*

13 of the Bareboat Charter, any amounts due under the Bareboat Charter not paid when due

14 shall bear interest thereafter from the due date thereof until payment at a rate equal to three

15 month LIBOR plus 5.30% ("Default Interest").

16       14.    Accordingly, as a consequence of the foregoing and under the terms of the

17 Bareboat Charter, defendant Marka Shipping owes to plaintiff Octavian LLC the sum of **US**

18 **$41,226,550** plus Default Interest on the outstanding hire as set out in (A) below, which

19 Termination Payment is comprised of:

20       (A) US$1,226,550, which represents all hire due and outstanding as at the

21 Termination Date, the calculation of such hire being reflected in paragraph 8 above,

22 which amount is subject to Default Interest accruing from the date each such hire

23 payment was due; plus

24       (B) The Termination Payment Amount of US$39,500,000 as per Additional

25 Clause 39(f) of the Bareboat Charter, such amount being (i) US$41,800,000 (the

26 amount set out for the relevant period of the Bareboat Charter) less (ii) the unpaid

27 Sellers' Loan, as defined in the Bareboat Charter, of US$2,300,000; plus

28 ////

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO,
CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

HS.Varamo

-4-

1         (C) US$500,000, which represents current estimated costs, including

2         estimated legal fees and expenses, incurred in connection with enforcing our rights

3         related to the Termination Events; provided that, we reserve the right to modify this

4         sum as appropriate.

5       15.    Further, Default Interest on the Termination Payment shall accrue from the

6   June 17, 2013, demand for payment.

7              **RULE D PETITION FOR POSSESSION OF THE VESSEL**

8       16.    Defendant Marka Shipping has failed to abide by the terms of the Bareboat

9   Charter, as aforesaid.

10      17.    A controversy has arisen regarding OCTAVIAN's immediate right to

11   possession of the Vessel to facilitate the Termination provisions and remedies under the

12   Bareboat Charter. Pursuant to Rule D of the Supplemental Rules, OCTAVIAN is entitled to

13   bring an action for possession of the Vessel.

14                   **PRAYER FOR RELIEF**

15      COMES NOW Plaintiff OCTAVIAN and prays for the following relief:

16      A.    For an order directing the Vessel to respond to the Complaint;

17      B.    That a Warrant of Arrest in due form of law and according to the practice of

18   this Honorable Court in cases of admiralty or maritime jurisdiction may issue herein against

19   the defendant Vessel pursuant to Supplemental Rule D;

20      C.    For an order issuing that plaintiff Octavian is entitled to possession of the

21   Vessel her engines, tackle, gear, and appurtenances;

22      D.    For judgment in favor of plaintiff Octavian and enter an order confirming

23   Octavian's right to possession of the Vessel, her engines, tackle, gear, and appurtenances;

24      E.    For a declaration of the parties' rights and liabilities under the Bareboat

25   Charter, including but not limited to a finding that:

26      F.    Defendant Marka Shipping owes to plaintiff Octavian LLC the sum of **US**

27   **$41,226,550** plus Default Interest on the outstanding hire as set out in (1) below, which

28   Termination Payment is comprised of:

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO,
CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

HS.Varamo

-5-

VERIFIED COMPLAINT IN ADMIRALTY

Case No.

1         (1)  US$1,226,550, which represents all hire due and outstanding as at the

2   Termination Date, the calculation of such hire being reflected in paragraph 8 above,

3   which amount is subject to Default Interest accruing from the date each such hire

4   payment was due; plus

5         (2)  The Termination Payment Amount ofUS$39,500,000 as per Additional

6   Clause 39(f) of the Bareboat Charter, such amount being (i) US$41,800,000 (the

7   amount set out for the relevant period of the Bareboat Charter) less (ii) the unpaid

8   Sellers' Loan, as defined in the Bareboat Charter, of US$2,300,000; plus

9         (3)  US$500,000, which represents current estimated costs, including

10  estimated legal fees and expenses, incurred in connection with enforcing our rights

11  related to the Termination Events; provided that, we reserve the right to increase this

12  amount if our costs exceed US$500,000.

13        (3)  Default Interest on the Termination Payment from and after the June 17,

14  2013, demand for payment.

15      G.    For prejudgment interest (where Default Interest does not apply) on all sums

16  that shall be adjudged to be owed;

17      H.    For such other relief as may be appropriate, including attorneys' fees and

18  costs; and

19      I.    That Plaintiff receive such other and further relief as the Court deems just

20  and proper.

21  Dated:  June 20, 2013           COX, WOOTTON, GRIFFIN,
                                     HANSEN & POULOS, LLP

22                                       Attorneys for Plaintiff OCTAVIAN MARKA
                                     LLC

23

24

25                               By: _____

26                                   Rupert P. Hansen
                                 Max L. Kelley

27

28

COX, WOOTTON,
GRIFFIN, HANSEN
& POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO,
CA  94105
TEL: 415-438-4600
FAX: 415-438-4601

HS. Varamo

-6-

# EXHIBIT 1



# TRANSCRIPT OF REGISTER

| Official and IMO No. | Call Sign | Name of Ship | Home Port |
|---|---|---|---|
| 9512484 | 9HA2696 | **MARKA** | VALLETTA |

| Framework & Description of Vessel | When and Where Built |
|---|---|
| STEEL OIL/CHEMICAL TANKER | 2012 - SPP SHIPBUILDING CO LTD, ANJEONG, KOREA |

| Previous registry |
|---|
| PROVISIONALLY REGISTERED IN MALTA ON 26.04.2012 |

| Rigged | NOT | Registered Dimensions | | Particulars of Tonnage |
|---|---|---|---|---|
| Stem | RAKED W/BULB | | Metres | Gross Tonnage |
| Stern | TRANSOM | Length Article 2(8) | 221.28 | **42193** |
| Build | CARVEL | Moulded Breadth Reg 2(3) | 32.24 | |
| No. of Decks | ONE | Moulded depth Reg 2(2) | 20.65 | Net Tonnage |
| No. of Masts | TWO | Moulded Draught Reg 4(2) | 14.25 | **21812** |
| No. of bulkheads | EIGHT | Length of Engine Room | 24.80 | |

| Propulsion | Number and Description of Engines | Power |
|---|---|---|
| MOTOR SHIP SINGLE SCREW | ONE INTERNAL COMBUSTION | Combined KW 13560 Estimated Speed of Ship 16 knots |

| Engine Makers and Year of Make | No. of Cylinders in each Set |
|---|---|
| DOOSAN ENGINE CO LTD, KOREA - 2011 | SIX Diameter of Cylinders 600mm Length of Stroke 2400mm |

The number of seamen and apprentices for whom accommodation is certified: 26

| Name/s, Residence and Description of Owners | Proportion of Shares |
|---|---|
| OCTAVIAN MARKA LLC - IMO ID NO.5658074 TRUST COMPANY COMPLEX, AJELTAKE ROAD AJELTAKE ISLAND MAJURO MARSHALL ISLANDS RESIDENT AGENT FOR OCTAVIAN MARKA LLC: FENLEX CORPORATE SERVICES LTD 85, ST JOHN'S STREET VALLETTA, MALTA | SOLE OWNER |

CHARTERERS: MARKA SHIPPING LTD
198, OLD BAKERY STREET,
VALLETTA, MALTA

I hereby Certify that:
- A Power of Attorney dated 26 April 2012 granted by Octavian Marka LLC in favour of Norddeutsche Landesbank Girozentrale was registered on the 7 May 2012.
- To date, no proof of ownership has been produced and the vessel has been provisionally registered solely on the strength of a declaration of ownership.
- For the purpose of MSA Article 85, MARKA SHIPPING LTD as operators under charter had paid an amount equal to the annual tonnage tax, in addition to that paid by the owners for a period ending 25 April 2013.
- In terms of Article 18A of the Merchant Shipping Act, a certificate of Malta Registry has been issued in the name of the charterers mentioned above.
- This printed data is a true extract from the Register now in my charge, showing the descriptive particulars, registered ownership and registered interest as on 07 May 2012.

FOR PARTICULARS OF ENCUMBRANCES (IF ANY) AND SIGNATURE SEE OVERLEAF

| Name of transaction | Letter denoting Mortgage | Proportion of shares affected | Date and hour of registry | Mortgage date |
|---|---|---|---|---|
| Mortgage | A | All the Shares | 26 April 2012 at 1017 Hours | 26 April 2012 |

**Summary**

TO SECURE SUMS DUE ON (I) A LOAN AGREEMENT DATED 20 APRIL 2012 IN RESPECT OF A LOAN FACILITY IN THE AMOUNT OF UP TO US$28,700,000 (TWENTY EIGHT MILLION SEVEN HUNDRED THOUSAND UNITED SATES DOLLARS) (II) A DEED OF COVENANTS DATED 26 APRIL 2012 AND (III) ANY AND ALL FUTURE OBLIGATIONS UNDER ANY MASTER AGREEMENT ON THE 2002 ISDA MASTER AGREEMENT (MULTICURRENCY-CROSSBORDER) FORM IN RESPECT OF UP TO A PRINCIPAL AMOUNT OF US$38,310,000 (THIRTY EIGHT MILLION, THREE HUNDRED AND TEN THOUSAND UNITED STATES DOLLARS)

**Name, residence and description of mortgagee(s)**

NORDDEUTSCHE LANDESBANK GIROZENTRALE, 10, FRIEDRICHSWALL, HANOVER 30159, GERMANY - AS AGENT AND SECURITY TRUSTEE PURSUANT TO THE LOAN AGREEMENT

**Prohibitions**

PROHIBITING THE CREATION OF FURTHER MORTGAGES OVER AND THE TRANSFER OF THE VESSEL OR SHARE THEREIN WITHOUT THE PRIOR WRITTEN CONSENT OF THE MORTGAGEE.

Issued this 08 May 2012.

PETER BUHAGIAR
Registrar of Ships
Valletta, Malta

# EXHIBIT 2

| 1.   Shipbroker<br>Not Applicable | BIMCO STANDARD BAREBOAT CHARTER<br>CODE NAME: "BARECON 2001" |
| --- | --- |
| | PART I |
| | 2.   Place and date<br>New York, New York, April 20, 2012 |
| 3.   Owners/Place of business (Cl.1)<br>Octavian Marka LLC<br>c/o Octavian Maritime Holdings, Inc. (as agent)<br>745 Fifth Avenue, New York, NY 10151. | 4.   Bareboat Charterers/Place of business (Cl.1)<br>Marka Shipping Ltd.<br>199, Old Bakery Street,<br>Valletta, Malta |
| 5.   Vessel's name, call sign and flag (Cl. 1 and 3)<br>MARKA, 9HA2696; Malta | |
| 6.   Type of Vessel<br><br>Crude / Product Oil Tanker | 7.   GT/NT<br><br>42,193/21,812 |
| 8.   When/Where built<br><br>2011 / SPP Shipbuilding Co. Ltd. Shipyard in Tong Young, Korea | 9.   Total DWT (abt.) in metric tons on summer freeboard<br><br>73,500 |
| 10.   Classification Society (Cl.3)<br><br>American Bureau of Shipping | 11.   Date of last special survey by the Vessel's classification society<br><br>N/A |
| 12.   Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3)<br><br>Not applicable | |
| 13.   Port or Place of delivery (Cl. 3)<br><br>In international waters, or such other location to be agreed upon by Owners and Charterers | 14.   Time for delivery (Cl. 4)<br><br>See Additional Clause 27 | 15.   Cancelling date (Cl. 5)<br><br>Not applicable |
| 16.   Port or Place of redelivery (Cl.15)<br><br>See also Additional Clause 34 | 17.   No. of months' validity of trading and class certificates upon redelivery (Cl. 15)<br><br>See Additional Clause 35 | |
| 18.   Running days' notice if other than stated in Cl. 4<br><br>Notice is not applicable | 19.   Frequency of dry-docking (Cl.10(g))<br><br>See Clause 10(g) | |
| 20.   Trading limits (Cl. 6)<br><br>Subject to Clause 6, world wide within I.W.L., but excluding any waters with U.S. Embargo (which includes, without limitation, Cuba, the Islamic Republic of Iran and North Korea) | | |
| 21.   Charter period (Cl.2)<br>60 months from delivery | 22.   Charter hire (Cl. 11)<br><br>See Additional Clause 32 | |

SK-27889 0005 1257316.V2

| | |
|---|---|
| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29) (Cl. 10(a)(ii))<br><br>See also Additional Clause 31(b) | |
| 24. Rate of interest payable acc. to Cl. 11(f) and, if applicable, acc. to PART IV<br><br>See Additional Clause 40 | 25. Currency and method of payment (Cl.11)<br><br>U.S. dollars. See Additional Clause 32. |
| 26. Place of payment; also state beneficiary and bank account (Cl. 11)<br>See Additional Clause 32(c) | 27. Bank guarantee/bond (sum and place) (Cl. 24) (optional)<br><br>Not applicable |
| 28. Mortgage(s), if any, (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business) (Cl. 12)<br><br>Clause 12(b) applies. First Priority Mortgage and related Deed of Covenants made by Owner in favor of Norddeutsche Landesbank Girozentrale, as Mortgagee and Security Trustee, dated on or about April 26, 2011 | 29. Insurance (hull and machinery and war risks) (state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies)<br><br>See Additional Clause 33 |
| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br><br>No limitation | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b) or, if applicable, Cl. 14(g))<br><br>No limitation |
| 32. Latent defects (only to be filled in if period other than stated in Cl. 3)<br><br>Not applicable | 33. Brokerage Commission and to whom payable (Cl.27)<br><br>Not applicable |
| 34. Grace period (state number of clear banking days) (Cl. 28)<br><br>See Additional Clause 39 | 35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration must be stated (Cl.30)<br><br>See Additional Clause 49 |
| 36. War cancellation (indicate countries agreed) (Cl. 26(f))<br>Not applicable | |
| 37. Newbuilding Vessel (indicate with "yes" or "no" whether PART III applies) (optional)<br><br>No | 38. Name and place of Builders (only to be filled in if PART III applies)<br><br>Not applicable |
| 39. Vessel's Yard Building No. (only to be filled in if PART III applies)<br><br>Not applicable | 40. Date of Building Contract (only to be filled in if PART III applies)<br><br>Not applicable |
| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1). See Additional Clause 39(f)<br>a) N/A<br>b)<br>c) | |
| 42. Hire/Purchase agreement (indicate with "yes" or "no" whether PART IV applies) (optional) | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether PART V applies) (optional) |

[Signature Page: MARKA Bareboat Charter Agreement]

| No, but see Additional Clause 52 | No |
|---|---|
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies)<br><br>Not applicable | 45. Country of Underlying Registry (only to be filled in if PART V applies)<br><br>Not applicable |
| 46. Number of additional clauses covering special provisions, if agreed<br><br>Additional Clauses 27-63 | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II.  In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further.  It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in the Boxes 37, 42 and 43.  If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART 1 and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| **OCTAVIAN MARKA LLC**<br>By: Octavian Maritime Holdings, Inc.,<br>as sole manager<br><br>By: _____<br>Name:  Svein Engh<br>Title:   Chief Executive Officer | **MARKA SHIPPING LTD.**<br><br>By: _____<br>Name:<br>Title: |

[Signature Page: MARKA Bareboat Charter Agreement]

| No, but see Additional Clause 52 | No |
|---|---|
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if PART V applies)<br><br>Not applicable | 45. Country of Underlying Registry (only to be filled in if PART V applies)<br><br>Not applicable |
| 46. Number of additional clauses covering special provisions, if agreed<br><br>Additional Clauses 27-63 | |

PREAMBLE - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in the Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART 1 and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners)<br><br>**OCTAVIAN MARKA LLC**<br>By: Octavian Maritime Holdings, Inc.,<br>as sole manager<br><br>By: _____<br>Name: Svein Engh<br>Title: Chief Executive Officer | Signature (Charterers)<br><br>**MARKA SHIPPING LTD.**<br><br>By: _____<br>Name: MEHMET MAT<br>Title: ATTORNEY IN FACT |

[Signature Page: MARKA Bareboat Charter Agreement]

## PART II

## "BARECON 2001" STANDARD BAREBOAT CHARTER

1   **Definitions; see also Additional Clause 56**

In this Charter, the following terms shall have the meanings hereby assigned to them –

*"The Owners"* shall mean the party identified in Box 3;

*"The Charterers"* shall mean the party identified in Box 4;

*"The Vessel"* shall mean the vessel named in Box 5 and with particulars as stated or referred to in Boxes 6 to 12; and

*"Financial Instrument"* means the mortgage, deed of covenant or other such financial security instrument as stated or referred to in Box 28.

2   **Charter Period**

In consideration of the hire detailed in Box 22, the Owners have agreed to let and the Charterers have agreed to hire the Vessel for the period stated in Box 21 ("The Charter Period").

3   **Delivery** *(not applicable when Part III applies, as indicated in Box 37)*   See Additional Clause 27.

(a)  ~~The Owners shall before and at the time of delivery exercise due diligence to make the Vessel seaworthy and in every respect ready in hull, machinery and equipment for service under this Charter. The Vessel shall be delivered by the Owners and taken over by the Charterers at the port or place indicated in Box 13 in such ready safe berth as the Charterers may direct.~~

(b)  ~~The Vessel shall be properly documented on delivery in accordance with the laws of the flag State indicated in Box 5 and the requirements of the classification society stated in Box 10. The Vessel upon delivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 12.~~

(c)  ~~The delivery of the Vessel by the Owners and the taking over of the Vessel by the Charterers shall constitute a full performance by the Owners of all the Owners' obligations under this Clause 3, and thereafter the Charterers shall not be entitled to make or assert any claim against the Owners on account of any conditions, representations or warranties expressed or implied with respect to the Vessel but the Owners shall be liable for the cost of but not the time for repairs or renewals occasioned by latent defects in the Vessel, her machinery or appurtenances, existing at the time of delivery under this Charter, provided such defects have manifested~~

4



~~themselves within twelve (12) months after delivery unless otherwise provided in Box 32.~~

**4** **Time for Delivery** *(not applicable when Part III applies, as indicated in Box 37)*

~~The Vessel shall not be delivered before the date indicated in Box 14 without the Charterers' consent and the Owners shall exercise due diligence to deliver the Vessel not later than the date indicated in Box 15. Unless otherwise agreed in Box 18, the Owners shall give the Charterers not less than thirty (30) running days' preliminary and not less than fourteen (14) running days' definite notice of the date on which the Vessel is expected to be ready for delivery. The Owners shall keep the Charterers closely advised of possible changes in the Vessel's position.~~

**5** **Cancelling** *(not applicable when Part III applies, as indicated in Box 37)*

(a) ~~Should the Vessel not be delivered latest by the cancelling date indicated in Box 15, the Charterers shall have the option of cancelling this Charter by giving the Owners notice of cancellation within thirty-six (36) running hours after the cancelling date stated in Box 15, failing which this Charter shall remain in full force and effect.~~

(b) ~~If it appears that the Vessel will be delayed beyond the cancelling date, the Owners may, as soon as they are in a position to state with reasonable certainty the day on which the Vessel should be ready, give notice thereof to the Charterers asking whether they will exercise their option of cancelling, and the option must then be declared within one hundred and sixty-eight (168) running hours of the receipt by the Charterers of such notice or within thirty-six (36) running hours after the cancelling date, whichever is the earlier. If the Charterers do not then exercise their option of cancelling, the seventh day after the readiness date stated in the Owners' notice shall be substituted for the cancelling date indicated in Box 15 for the purpose of this Clause 5.~~

(c) ~~Cancellation under this Clause 5 shall be without prejudice to any claim the Charterers may otherwise have on the Owners under this Charter.~~

**6** **Trading Restrictions**

The Vessel shall be employed in lawful trades for the carriage of suitable lawful merchandise <u>in such waters and environments as the Vessel's capabilities and specifications allow</u> within the trading limits indicated in Box 20.

The Charterers undertake not to employ the Vessel or suffer the Vessel to be employed otherwise than in conformity with the terms of the contracts of insurance (including any warranties expressed or implied therein) without first obtaining the consent of the insurers to such employment and complying with such requirements as to extra premium or otherwise as the insurers may prescribe.



The Charterers also undertake not to employ the Vessel or suffer her employment in any trade or business which is forbidden by the law of the United States of America, the European Union, the flag state or any country to which the Vessel may sail or is otherwise illicit or in carrying illicit or prohibited goods or in any manner whatsoever which may render her liable to condemnation, destruction, seizure or confiscation.

Notwithstanding any other provisions contained in this Charter it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter. This exclusion does not apply to radio-isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purposes provided the Owners' prior approval has been obtained to loading thereof.

7    **Surveys on Delivery and Redelivery** *(not applicable when Part III applies, as indicated in Box 37)* See Additional Clause 35.

~~The Owners and Charterers shall each appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of delivery and redelivery hereunder. The Owners shall bear all expenses of the On-hire Survey including loss of time, if any, and the Charterers shall bear all expenses of the Off-hire Survey including loss of time, it any, at the daily equivalent to the rate of hire or pro rata thereof.~~

8    **Inspection**

The Owners or their mortgagee(s) shall have the right at any time after giving reasonable notice to the Charterers to inspect or survey the Vessel or instruct a duly authorised surveyor to carry out such survey on their behalf:-

(a)    to ascertain the condition of the Vessel and satisfy themselves that the Vessel is being properly repaired and maintained. The costs and fees for such inspection or survey shall be paid by the Owners unless the Vessel is found to require repairs or maintenance in order to achieve the condition so provided;

(b)    in dry-dock if the Charterers have not dry-docked ~~her~~the Vessel in accordance with Clause 10(g). The costs and fees for such inspection or survey shall be paid by the Charterers; and

(c)    for any other commercial reason they consider necessary (provided it does not unduly interfere with the commercial operation of the Vessel). The costs and fees for such inspection and survey shall be paid by the Owners.

All time used in respect of inspection, survey or repairs shall be for the Charterers' account and form part of the Charter Period. The Charterers shall also permit the Owners to inspect the Vessel's log books and insurance records whenever requested and shall whenever required by the Owners furnish them with full information regarding any casualties or other accidents or damage to the Vessel.



6

**9**　　**Inventories, Oil and Stores**　See Additional Clause 29.

~~A complete inventory of the Vessel's entire equipment, outfit including spare parts, appliances and of all consumable stores on board the Vessel shall be made by the Charterers in conjunction with the Owners on delivery and again on redelivery of the Vessel. The Charterers and the Owners, respectively, shall at the time of delivery and redelivery take over and pay for all bunkers, lubricating oil, unbroached provisions, paints, ropes and other consumable stores (excluding spare parts) in the said Vessel at the then current market prices at the ports of delivery and redelivery, respectively. The Charterers shall ensure that all spare parts listed in the inventory and used during the Charter Period are replaced at their expense prior to redelivery of the Vessel.~~

**10**　　**Maintenance and Operation**

    (a)　　(i)　　Maintenance and Repairs - During the Charter Period the Vessel shall be in the full possession and at the absolute disposal for all purposes of the Charterers and under their complete control in every respect. The Charterers shall maintain the Vessel, her machinery, boilers, appurtenances and spare parts in a good state of repair, in efficient operating condition and in accordance with good commercial maintenance practice and~~, except as provided in Clause 14(l), if applicable~~, at their own expense they shall at all times maintain the highest class for the Vessel with the Classification Society indicated in Box 10 free of overdue recommendations and conditions affecting the Vessel's class ~~keep the Vessel's Class fully up to date with the Classification Society indicated in Box 10~~ and maintain all other necessary certificates in force at all times.

           (ii)　　New Class and Other Safety Requirements — ~~In the event of any improvement, structural changes or new equipment becoming necessary for the continued operation of the Vessel by reason of new class requirements or by compulsory legislation costing (excluding the Charterers' loss of time) more than the percentage stated in Box 23, or if Box 23 is left blank, 5 per cent of the Vessel's insurance value as stated in Box 29, then the extent, if any, to which the rate of hire shall be varied and the ratio in which the cost of compliance shall be shared between the parties concerned in order to achieve a reasonable distribution thereof as between the Owners and the Charterers having regard, inter alia, to the length of the period remaining under this Charter shall, in the absence of agreement, be referred to the dispute resolution method agreed in Clause 30.~~ See Additional Clause 31.

           (iii)　　Financial Security - The Charterers shall maintain financial security or responsibility in respect of third party liabilities as required by any government, including federal, state or municipal or other division or authority thereof, to enable the Vessel, without penalty or charge, lawfully to enter, remain at, or leave any port, place, territorial or contiguous waters of any country, state or municipality in performance of this Charter without any delay. This obligation



7

shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof.

The Charterers shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Charterers' sole expense and the Charterers shall indemnify the Owners against all consequences whatsoever (including loss of time) for any failure or inability to do so.

(b)  Operation of the Vessel - The Charterers shall at their own expense and by their own procurement man, victual, navigate, operate, supply, fuel and, whenever required, repair the Vessel during the Charter Period and they shall pay all charges and expenses of every kind and nature whatsoever incidental to their use and operation of the Vessel under this Charter, including annual flag State fees and any foreign general municipality and/or state taxes. The Master, officers and crew of the Vessel shall be the servants of the Charterers for all purposes whatsoever, even if for any reason appointed by the Owners.

Charterers shall comply with the regulations regarding officers and crew in force in the country of the Vessel's flag or any other applicable law.

(c)  The Charterers shall keep the Owners and the mortgagee(s) advised of the intended employment, planned dry-docking and major repairs of the Vessel, as reasonably required.

(d)  Flag and Name of Vessel - During the Charter Period, the Charterers shall have the liberty to paint the Vessel in their own colours, install and display their funnel insignia and fly their own house flag. The Charterers shall also have the liberty, with the Owners' written consent, which shall not be unreasonably withheld, to change the flag and/or the name of the Vessel during the Charter Period. Painting and re-painting, instalment and re-instalment, registration and re-registration, if required by the Owners, shall be at the Charterers' expense and time.

(e)  Changes to the Vessel – See Additional Clause 31(a). Subject to Clause 10(a)(ii), the Charterers shall make no structural changes in the Vessel or changes in the machinery, boilers, appurtenances or spare parts thereof without in each instance first securing the Owners' approval thereof. If the Owners so agree, the Charterers shall, if the Owners so require, restore the Vessel to its former condition before the termination of this Charter.

(f)  Use of the Vessel's Outfit, Equipment and Appliances - The Charterers shall have the use of all outfit, equipment and appliances on board the Vessel at the time of delivery, provided the same or their substantial equivalent shall be returned to the Owners on redelivery in the same good order and condition as when received, ordinary wear and tear excepted. The Charterers shall from time to time during the Charter Period replace such items of equipment as shall be so damaged or worn as to be unfit for use.

8



The Charterers are to procure that all repairs to or replacement of any damaged, worn or lost parts or equipment be effected in such manner (both as regards workmanship and quality of materials) as not to diminish the value of the Vessel. The Charterers have the right to fit additional equipment at their expense and risk but the Charterers shall remove such equipment at the end of the period if requested by the Owners. Any equipment including radio equipment on hire on the Vessel at time of delivery shall be kept and maintained by the Charterers and the Charterers shall assume the obligations and liabilities of the Owners under any lease contracts in connection therewith and shall reimburse the Owners for all expenses incurred in connection therewith, also for any new equipment required in order to comply with radio regulations.

(g)  Periodical Dry-Docking - The Charterers shall dry-dock the Vessel and clean and paint her underwater parts whenever the same may be necessary, but not less than once ~~during the period stated in Box 19 or, if Box 19 has been left blank,~~ every thirty six (36)~~[sixty (60)] ]~~ calendar months after delivery or such other period as may be required by the Classification Society or flag state.

**11   Hire**  See Additional Clause 32.

(a)  ~~The Charterers shall pay hire due to the Owners punctually in accordance with the terms of this Charter in respect of which time shall be of the essence.~~

(b)  ~~The Charterers shall pay to the Owners for the hire of the Vessel a lump sum in the amount indicated in Box 22 which shall be payable not later than every thirty (30) running days in advance, the first lump sum being payable on the date and hour of the Vessel's delivery to the Charterers. Hire shall be paid continuously throughout the Charter Period.~~

(c)  ~~Payment of hire shall be made in cash without discount in the currency and in the manner indicated in Box 25 and at the place mentioned in Box 26.~~

(d)  ~~Final payment of hire, if for a period of less than thirty (30) running days, shall be calculated proportionally according to the number of days and hours remaining before redelivery and advance payment to be effected accordingly.~~

(e)  ~~Should the Vessel be lost or missing, hire shall cease from the date and time when she was lost or last heard of. The date upon which the Vessel is to be treated as lost or missing shall be ten (10) days after the Vessel was last reported or when the Vessel is posted as missing by Lloyd's, whichever occurs first. Any hire paid in advance to be adjusted accordingly.~~

(f)  ~~Any delay in payment of hire shall entitle the Owners to interest at the rate per annum as agreed in Box 24. If Box 24 has not been filled in, the three months interbank offered rate in London (LIBOR or its successor) for the currency stated in Box 25, as quoted by the British Bankers' Association (BBA) on the date when the hire fell due, increased by 2 per cent., shall apply.~~

9



(g) ~~Payment of interest due under sub-clause 11(f) shall be made within seven (7) running days of the date of the Owners' invoice specifying the amount payable or, in the absence of an invoice, at the time of the next hire payment date.~~

**12    Mortgage** *(only to apply if Box 28 has been appropriately filled in)*   See Additional Clause 37.

(a) ~~The Owners warrant that they have not effected any mortgage(s) of the Vessel and that they shall not effect any mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~

(b) The Vessel chartered  under this Charter is financed by a mortgage according to the Financial Instrument.   The Charterers undertake to comply, and provide such information and documents to enable the Owners to comply, with all such instructions or directions in regard to the employment, insurances, operation, repairs and maintenance of the Vessel as laid down in the Financial Instrument or as may be directed from time to time during the currency of the Charter by the mortgagee(s) in conformity with the Financial Instrument.   The Charterers confirm that, for this purpose, they have acquainted themselves with all relevant terms, conditions and provisions of the Financial Instrument and agree to acknowledge this in writing in any form that may be required by the mortgagee(s).   The Owners warrant that <u>as of the Delivery Date</u> they have not effected any mortgagee(s) other than stated in Box 28 ~~and that they shall not agree to any amendment of the mortgage(s) referred to in Box 28 or effect any other mortgage(s) without the prior consent of the Charterers, which shall not be unreasonably withheld.~~

*~~(Optional, Clauses 12(a) and 12(b) are alternatives; indicate alternative agreed in Box 28).~~*

**13    Insurance and Repairs**  See Additional Clause 33.

(a) ~~During the Charter Period the Vessel shall be kept insured by the Charterers at their expense against hull and machinery, war and Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with sub-clause 10(a)(iii)) in such form as the Owners shall in writing approve, which approval shall not be unreasonably withheld. Such insurances shall be arranged by the Charterers to protect the interest of both the Owners and Charterers and the mortgagee(s) and the Charterers shall be at liberty to protect under such insurances the interest of any managers they may appoint. Insurance policies shall cover the Owners and the Charterers according to their respective interests. Subject to the provisions of the Financial Instrument, if any, and the approval of the Owners and the insurers, the Charterers shall effect all insured repairs and shall undertake settlement and reimbursement from the insurers of all costs in connection with such repairs as well as insured charges, expenses and liabilities to the extent of coverage under the insurances herein provided for.~~



~~The Charterers are also to remain responsible for and to effect repairs and settlements~~
~~of costs and expenses incurred thereby in respect of all other repairs not covered by~~
~~the insurances and/or not exceeding any possible franchise(s) or deductibles provided~~
~~for in the insurances.~~

~~All time used for repairs under the provisions of sub-clause 13(a) and for repairs of~~
~~latent defects according to Clause 3(c) above, including any deviation, shall be for the~~
~~Charterers' account.~~

(b) ~~If the conditions of the above insurances permit additional insurance to be~~
~~placed by the parties, such cover shall be limited to the amount for each party set out~~
~~in Box 30 and Box 31, respectively. The Owners or the Charterers as the case may be~~
~~shall immediately furnish the other party with particulars of any additional insurance~~
~~effected, including copies of any cover notes or policies and the written consent of the~~
~~insurers of any such required insurance in any case where the consent of such insurers~~
~~is necessary.~~

(c) ~~The Charterers shall upon the request of the Owners, provide information and~~
~~promptly execute such documents as may be required to enable the Owners to comply~~
~~with the insurance provisions of the Financial Instrument.~~

(d) ~~Subject to the provisions of the Financial Instrument, if any, should the Vessel~~
~~become an actual, constructive, compromised or agreed total loss under the insurances~~
~~required under sub-clause 13(a), all insurance payments for such loss shall be paid to~~
~~the Owners who shall distribute the moneys between the Owners and the Charterers~~
~~according to their respective interests. The Charterers undertake to notify the Owners~~
~~and the mortgagee(s), if any, of any occurrences in consequence of which the Vessel is~~
~~likely to become a total loss as defined in this Clause.~~

(e) ~~The Owners shall upon the request of the Charterers, promptly execute such~~
~~documents as may be required to enable the Charterers to abandon the Vessel to~~
~~insurers and claim a constructive total loss.~~

(f) ~~For the purpose of insurance coverage against hull and machinery and war~~
~~risks under the provisions of sub-clause 13(a), the value of the Vessel is the sum~~
~~indicated in Box 29.~~

14    **Insurance, Repairs and Classification** *(Optional, only to apply if expressly agreed and*
*stated in Box 29, in which event Clause 13 shall be considered deleted.)* See Additional
Clause 33 and Clause 10(a)(i).

(a) ~~During the Charter Period the Vessel shall be kept insured by the Owners at~~
~~their expense against hull and machinery and war risks under the form of policy or~~
~~policies attached hereto. The Owners and/or insurers shall not have any right of~~
~~recovery or subrogation against the Charterers on account of loss of or any damage to~~
~~the Vessel or her machinery or appurtenances covered by such insurance, or on~~



11

account of payments made to discharge claims against or liabilities of the Vessel or the Owners covered by such insurance. Insurance policies shall cover the Owners and the Charterers according to their respective interests.

(b) During the Charter Period the Vessel shall be kept insured by the Charterers at their expense against Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with the sub-clause 10(a)(iii)) in such form as the Owners shall in writing approve which approval shall not be unreasonably withheld.

(c) In the event that any act or negligence of the Charterers shall vitiate any of the insurance herein provided, the Charterers shall pay to the Owners all losses and indemnify the Owners against all claims and demands which would otherwise have been covered by such insurance.

(d) The Charterers shall, subject to the approval of the Owners or Owners' Underwriters, effect all insured repairs, and the Charterers shall undertake settlement of all miscellaneous expenses in connection with such repairs as well as all insured charges, expenses and liabilities, to the extent of coverage under the insurances provided for under the provisions of sub-clause 14(a). The Charterers to be secured reimbursement through the Owners' Underwriters for such expenditures upon presentation of accounts.

(e) The Charterers to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.

(f) All time used for repairs under the provisions of sub-clauses 14(d) and 14(e) and for repairs of latent defects according to Clause 3 above, including any deviation, shall be for the Charterers' account and shall form part of the Charter Period.

The Owners shall not be responsible for any expenses as are incident to the use and operation of the Vessel for such time as may be required to make such repairs.

(g) If the conditions of the above insurances permit additional insurance to be placed by the parties such cover shall be limited to the amount for each party set out in Box 30 and Box 31, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars or any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any case where the consent of such insurers is necessary.

(h) Should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause 14(a), all insurance payments



12



~~for such loss shall be paid to the Owners, who shall distribute the moneys between themselves and the Charterers according to their respective interests.~~

(i) ~~—If the Vessel becomes an actual, constructive, compromised or agreed total loss under the insurances arranged by the Owners in accordance with sub-clause 14(a), this Charter shall terminate as of the date of such loss.~~

(j) ~~—The Charterers shall upon the request of the Owners, promptly execute such documents as may be required to enable the Owners to abandon the Vessel to the insurers and claim a constructive total loss.~~

(k) ~~—For the purpose of insurance coverage against hull and machinery and war risks under the provisions of sub-clause 14(a), the value of the Vessel is the sum indicated in Box 29.~~

(l) ~~—Notwithstanding anything contained in sub-clause 10(a), it is agreed that under the provisions of Clause 14, if applicable, the Owners shall keep the Vessel's Class fully up-to-date with the Classification Society indicated in Box 10 and maintain all other necessary certificates in force at all times.~~

**15   Redelivery  See also Additional Clause 34.**

~~At the expiration of the Charter Period the Vessel shall be redelivered by the Charterers to the Owners at a safe and ice-free port or place as indicated in Box 16, in such ready safe berth as the Owners may direct.~~ The Charterers shall give the Owners not less than thirty (30) running days' preliminary notice of the expected date, range of ports of redelivery or port or place of re-delivery and not less than fourteen (14) running days' definite notice of expected date and port or place of redelivery. Any changes thereafter in Vessel's position shall be notified immediately to the Owners.

The Charterers ~~warrant that they~~ will not permit the Vessel to commence a voyage (including any preceding ballast voyage) which cannot reasonably be expected to be completed in time to allow redelivery of the Vessel within the Charter Period. ~~Notwithstanding the above, should the Charterers fail to redeliver the Vessel within the Charter Period, the Charterers shall pay the daily equivalent to the rate of hire stated in Box 22 plus 10 per cent. or to the market rate, whichever is the higher, for the number of days by which the Charter Period is exceeded. All other terms, conditions and provisions of this Charter shall continue to apply.~~

~~Subject to the provisions of Clause 10, the Vessel shall be redelivered to the Owners in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted.~~

~~The Vessel upon redelivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 17.~~

**16   Non-Lien  See also Additional Clause 50**

SK 27089 0005 1257316 v2

The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel or the first priority lien on the Vessel in favor of the Mortgagee under the Financial Instrument. The Charterers further agree to carry on board the Vessel a certified copy of the Mortgage and place and maintain in a conspicuous place in the navigation room and the Master's cabin of the Vessel a framed printed notice stating that the Vessel is mortgaged by the Owners to the Mortgagee, and to fasten to the Vessel in a conspicuous place and to keep so fastened during the Charter Period a notice reading as follows: -

> "This Vessel is the property of (name of Owners). It is under charter to (name of Charterers) and by the terms of the Charter Party neither the Charterers nor the Master have any right, power or authority to create, incur or permit to be imposed on the Vessel any lien whatsoever."

## 17   Indemnity

(a)    The Charterers shall indemnify the Owners against any loss, damage or expense incurred by the Owners arising out of or in relation to the operation of the Vessel by the Charterers, and against any lien of whatsoever nature arising out of an event occurring during the Charter Period. If the Vessel be arrested or otherwise detained by reason of claims or liens arising out of her operation hereunder by the Charterers, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail.

Without prejudice to the generality of the foregoing, the Charterers agree to indemnify the Owners against all consequences or liabilities arising from the Master, officers or agents signing Bills of Lading or other documents.

(b)    If the Vessel be arrested or otherwise detained by reason of a claim or claims against the Owners, the Owners shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail.

In such circumstances the Owners shall indemnify the Charterers against any loss, damage or expense incurred by the Charterers (including hire paid under this Charter) as a direct consequence of such arrest or detention.

## 18   Lien

The Owners to have a lien upon all cargoes and sub-hires and sub-freights belonging or due to the Charterers or any sub-charterers and any Bill of Lading freight for all claims under this Charter, and the Charterers to have a lien on the Vessel for all moneys paid in advance and not earned.

## 19   Salvage

14

All salvage and towage performed by the Vessel shall be for the Charterers' benefit and the cost of repairing damage occasioned thereby shall be borne by the Charterers.

**20    Wreck Removal**

In the event of the Vessel becoming a wreck or obstruction to navigation the Charterers shall indemnify the Owners against any sums whatsoever which the Owners shall become liable to pay and shall pay in consequence of the Vessel becoming a wreck or obstruction to navigation.

**21    General Average**

The Owners shall not contribute to General Average.

**22    Assignment, Sub-Charter and Sale    See Additional Clause 41.**

(a)          ~~The Charterers shall not assign this Charter nor sub-charter the Vessel on a bareboat basis except with the prior consent in writing of the Owners, which shall not be unreasonably withheld, and subject to such terms and conditions as the Owners shall approve.~~

(b)          ~~The Owners shall not sell the Vessel during the currency of this Charter except with the prior written consent of the Charterers, which shall not be unreasonably withheld, and subject to the buyer accepting an assignment of this Charter.~~

**23    Contracts of Carriage**

~~(a)~~    The Charterers are to procure that all documents issued during the Charter Period evidencing the terms and conditions agreed in respect of carriage of goods shall contain a paramount clause incorporating any legislation relating to carrier's liability for cargo compulsorily applicable in the trade; if no such legislation exists, the documents shall incorporate the Hague-Visby Rules. The documents shall also contain the New Jason Clause and the Both-to-Blame Collision Clause.

~~(b)    The Charterers are to procure that all passenger tickets issued during the Charter Period for the carriage of passengers and their luggage under this Charter shall contain a paramount clause incorporating any legislation relating to carrier's liability for passengers and their luggage compulsorily applicable in the trade; if no such legislation exists, the passenger tickets shall incorporate the Athens Convention Relating to the Carriage of Passengers and their Luggage by Sea, 1974, and any protocol thereto.~~

*Delete as applicable.*



15

24   **Bank Guarantee** *(Optional, only to apply if Box 27 filled in)*

~~The Charterers undertake to furnish, before delivery of the Vessel, a first class bank guarantee or bond in the sum and at the place as indicated in Box 27 as guarantee for full performance of their obligations under this Charter.~~

25   **Requisition/Acquisition**

(a)   In the event of the Requisition for Hire of the Vessel by any governmental or other competent authority (hereinafter referred to as "Requisition for Hire") irrespective of the date during the Charter Period when "Requisition for Hire" may occur and irrespective of the length thereof and whether or not it be for an indefinite or a limited period of time, and irrespective of whether it may or will remain in force for the remainder of the Charter Period, this Charter shall not be deemed thereby or thereupon to be frustrated or otherwise terminated and the Charterers shall continue to pay the stipulated hire in the manner provided by this Charter until the time when the Charter would have terminated pursuant to any of the provisions hereof always provided however that in the event of "Requisition for Hire" any Requisition Hire or compensation received or receivable by the Owners shall be payable to the Charterers during the remainder of the Charter Period or the period of the "Requisition for Hire" whichever be the shorter.

~~(b)   In the event of the Owners being deprived of their ownership in the Vessel by any Compulsory Acquisition of the Vessel or requisition for title by any governmental or other competent authority (hereinafter referred to as "Compulsory Acquisition"), then irrespective of the date during the Charter Period when "Compulsory Acquisition" may occur, this Charter shall be deemed terminated as of the date of such "Compulsory Acquisition". In such event Charter Hire to be considered as earned and to be paid up to the date and time of such "Compulsory Acquisition".~~

26   **War**

(a)   For the purpose of this Clause, the words "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)   The Charterers shall in the event of hostilities in any part of the world (whether war is declared or not), not cause or permit the Vessel to enter or trade to any zone which is declared a war zone by any government or by the Vessel's war risks insurers unless prior to entering any such zone the Charterers has (at its expense) effected any special,



16

additional or modified insurance cover which the Owners or the Mortgagee may require. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, the Owners and/or the Mortgagee shall have the right to require the Vessel to leave such area. ~~The Vessel, unless the written consent of the Owners be first obtained, shall not continue to or go through any port, place, area or zone (whether of land or sea), or any waterway or canal, where it reasonably appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, the Owners shall have the right to require the Vessel to leave such area.~~

(c)    The Vessel shall not load contraband cargo, or pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d)    If the insurers of the war risks insurance, when Clause 14 is applicable, should require payment of premiums, and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such insurers as being subject to additional premiums because of War Risks, then such premiums and/or calls, to the extent paid by the Owners, shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(e)    The Charterers shall have the liberty:

(i)    to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii)    to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii)    to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement.



17

(f)     In the event of outbreak of war (whether there be a declaration of war or not) ~~(i)~~ between any two or more of the following countries: the United States of America; Russia; the United Kingdom; France and the People's Republic of China, ~~(ii) between any two or more of the countries stated in Box 36, both the Owners and the Charterers shall have the right to cancel this Charter, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 15, if the Vessel has cargo on board after discharge thereof at destination, or if debarred under this Clause from reaching or entering it at a near, open and safe port as directed by the Owners, or if the Vessel has no cargo on board, at the port at which the Vessel then is or if at sea at a near, open and safe port as directed by the Owners. In all cases~~ all hire shall continue to be paid in accordance with Clause 11 and ~~except as aforesaid~~all other provisions of this Charter shall apply until ~~redelivery~~the end of the Charter Period.

~~27~~          ~~Commission~~

~~The Owners to pay a commission at the rate indicated in Box 33 to the Brokers named in Box 33 on any hire paid under the Charter. If no rate is indicated in Box 33, the commission to be paid by the Owners shall cover the actual expenses of the Brokers and a reasonable fee for their work.~~

~~If the full hire is not paid owing to breach of the Charter by either of the parties the party liable thereof shall indemnify the Brokers against their loss of commission. Should the parties agree to cancel the Charter, the Owners shall indemnify the Brokers against any loss of commission but in such case the commission shall not exceed the brokerage on one year's hire.~~

~~28~~          ~~Termination~~

~~(a)~~          ~~Charterers' Default~~

~~The Owners shall be entitled to withdraw the Vessel from the service of the Charterers and terminate the Charter with immediate effect by written notice to the Charterers if:~~

~~(i)~~          ~~the Charterers fail to pay hire in accordance with Clause 11. However, where there is a failure to make punctual payment of hire due to oversight, negligence, errors or omissions on the part of the Charterers or their bankers, the Owners shall give the Charterers written notice of the number of clear banking days stated in Box 34 (as recognised at the agreed place of payment) in which to rectify the failure, and when so rectified within such number of days following the Owners' notice, the payment shall stand as regular and punctual. Failure by the Charterers to pay hire within the number of days stated in Box 34 of their receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw the Vessel from the service of the Charterers and terminate the Charter without further notice;~~

~~(ii)~~          ~~the Charterers fail to comply with the requirements of:~~



(1) ~~Clause 6 (Trading Restrictions)~~

(2) ~~Clause 13(a) (Insurance and Repairs)~~

~~provided that the Owners shall have the option, by written notice to the Charterers, to give the Charterers a specified number of days grace within which to rectify the failure without prejudice to the Owners' right to withdraw and terminate under this Clause if the Charterers fail to comply with such notice;~~

(iii) ~~the Charterers fail to rectify any failure to comply with the requirements of sub-clause 10(a)(i) (Maintenance and Repairs) as soon as practically possible after the Owners have requested them in writing so to do and in any event so that the Vessel's insurance cover is not prejudiced.~~

(b) ~~Owners' Default~~

~~If the Owners shall by any act or omission be in breach of their obligations under this Charter to the extent that the Charterers are deprived of the use of the Vessel and such breach continues for a period of fourteen (14) running days after written notice thereof has been given by the Charterers to the Owners, the Charterers shall be entitled to terminate this Charter with immediate effect by written notice to the Owners.~~

(c) ~~Loss of Vessel~~

~~This Charter shall be deemed to be terminated if the Vessel becomes a total loss or is declared as a constructive or compromised or arranged total loss. For the purpose of this sub-clause, the Vessel shall not be deemed to be lost unless she has either become an actual total loss or agreement has been reached with her underwriters in respect of her constructive, compromised or arranged total loss or if such agreement with her underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred.~~

(d) ~~Either party shall be entitled to terminate this Charter with immediate effect by written notice to the other party in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of the other party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors.~~

(e) ~~The termination of this Charter shall be without prejudice to all rights accrued due between the parties prior to the date of termination and to any claim that either party might have.~~

~~29      Repossession~~

19

In the event of the termination of this Charter in accordance with the applicable provisions of Clause 28, the Owners shall have the right to repossess the Vessel from the Charterers at her current or next port of call, or at a port or place convenient to them without hindrance or interference by the Charterers, courts or local authorities.  Pending physical repossession of the Vessel in accordance with this Clause 29, the Charterers shall hold the Vessel as gratuitous bailee only to the Owners.  The Owners shall arrange for an authorised representative to board the Vessel as soon as reasonably practicable following the termination of the Charter.  The Vessel shall be deemed to be repossessed by the Owners from the Charterers upon the boarding of the Vessel by the Owners' representative.  All arrangements and expenses relating to the settling of wages, disembarkation and repatriation of the Charterers' Master, officers and crew shall be the sole responsibility of the Charterers.

30      Dispute Resolution

(a)      This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators.  A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified.  If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly.  The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b)      This Contract shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute

SK 27089 0005 1257316 v2

~~arising our of or in connection with this Contract shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that or any two of them shall be final, and for the purposes of enforcing any award, judgement may be entered on an award by any court of competent jurisdiction.  The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.~~

~~In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such sum as the parties may agree) the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced.~~

(c)      ~~The Contract shall be governed by and construed in accordance with the laws of the place mutually agreed by the parties and any dispute arising out of or in connection with this Contract shall be referred to arbitration at a mutually agreed place, subject to the procedures applicable there.~~

(d)      ~~Notwithstanding (a), (b) or (c) above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.~~

~~In the case, of a dispute in respect of which arbitration has been commenced under (a), (b) or (c) above, the following shall apply:-~~

(i)      ~~Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.~~

(ii)      ~~The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal (the "Tribunal") or such person as the Tribunal may designate for that purpose.  The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.~~

(iii)      ~~If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.~~

(iv)      ~~The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.~~

21



~~(v)        Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.~~

~~(vi)        Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.~~

~~(vii)        The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.~~

~~*(Note: The parties should be aware that the mediation process may not necessary interrupt time limits.)*~~

~~(c)        If Box 35 in Part 1 is not appropriately filled in, sub-clause 30(a) of this Clause shall apply. Sub-clause 30(d) shall apply in all cases.~~

~~*Sub-clauses 30(a), 30(b) and 30(c) are alternatives; indicate alternative agreed in Box 35.*~~

~~31        Notices~~

~~Any notice to be given by either party to the other party shall be in writing and may be sent by fax, telex, registered or recorded mail or by personal service.~~

~~(b)   The address of the Parties for service of such communication shall be as stated in Boxes 3 and 4 respectively.~~



22

## "BARECON 2001" Standard Bareboat Charter

### PART III

### PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY
(*Optional, only to apply if expressly agreed and stated in Box 37*)

1      ~~Specifications and Building Contract~~

(a)      ~~The Vessel shall be constructed in accordance with the Building Contract (hereafter called "the Building Contract") as annexed to this Charter, made between the Builders and the Owners and in accordance with the specifications and plans annexed thereto, such Building Contract, specifications and plans having been countersigned as approved by the Charterers.~~

(b)      ~~No change shall be made in the Building Contract or in the specifications or plans of the Vessel as approved by the Charterers as aforesaid without the Charterers' consent.~~

(c)      ~~The Charterer shall have the right to send their representative to the Builders' Yard to inspect the Vessel during the course of her construction to satisfy themselves that construction is in accordance with such approved specifications and plans as referred to under sub-clause (a) of this Clause.~~

(d)      ~~The Vessel shall be built in accordance with the Building Contract and shall be of the description set out therein.   Subject to the provisions of sub-clause 2(c)(ii) hereunder, the Charterers shall be bound to accept the Vessel from the Owners, completed and constructed in accordance with the Building Contract, on the date of delivery by the Builders.  The Charterers undertake that having accepted the Vessel they will not thereafter raise any claims against the Owners in respect of the Vessel's performance or specification or defects, if any.  Nevertheless, in respect of any repairs, replacements or defects which appear within the first twelve (12) months from delivery by the Builders, the Owners shall endeavour to compel the Builders to repair, replace or remedy any defects or to recover from the Builders any expenditure incurred in carrying out such repairs, replacements or remedies.   However, the Owners' liability to the Charterers shall be limited to the extent the Owners have a valid claim against the Builders under the guarantee clause of the Building Contract (a copy whereof has been supplied to the Charterers).  The Charterers shall be bound to accept such sums as the Owners are reasonably able to recover under this Clause and shall make no further claim on the Owners for the difference between the amount(s) so recovered and the actual expenditure on repairs, replacement or remedying defects or for any loss of time incurred.~~

~~Any liquidation damages for physical defects or deficiencies shall accrue to the account of the party stated in Box 41(a) or if not filled in shall be shared equally between the parties.  The costs of pursuing a claim or claims against the Builders under~~

23



this Clause (including any liability to the Builders) shall be borne by the party stated in Box 41(b) or if not filled in shall be shared equally between the parties.

3        **Time and Place of Delivery**

        Subject to the Vessel having completed her acceptance trials including trials of cargo equipment in accordance with the Building Contract and specifications to the satisfaction of the Charterers, the Owners shall give and the Charterers shall take delivery of the Vessel afloat when ready for delivery and properly documented at the Builders' Yard or some other safe and readily accessible dock, wharf or place as may be agreed between the parties hereto and the Builders. Under the Building Contract the Builders have estimated that the Vessel will be ready for delivery to the Owners as therein provided but the delivery date for the purpose of this Charter shall be the date when the Vessel is in fact ready for delivery by the Builders after completion of trials whether that be before or after as indicated in the Building Contract. The Charterers shall not be entitled to refuse acceptance of delivery of the Vessel and upon and after such acceptance, subject to Clause 1(d), the Charterers shall not be entitled to make any claim against the Owners in respect of any conditions, representations or warranties, whether express or implied, as to the seaworthiness of the Vessel or in respect of delay in delivery.

(b)     If for any reason other than a default by the Owners under the Building Contract, the Builders become entitled under that Contract not to deliver the Vessel to the Owners, the Owners shall upon giving to the Charterers written notice of Builders becoming so entitled, be excused from giving delivery of the Vessel to the Charterers and upon receipt of such notice by the Charterers this Charter shall cease to have effect.

(c)     If for any reason the Owners become entitled under the Building Contract to reject the Vessel the Owners shall, before exercising such right of rejection, consult the Charterers and thereupon

        (i)     if the Charterers do not wish to take delivery of the Vessel they shall inform the Owners within seven (7) running days by notice in writing and upon receipt by the Owners of such notice this Charter shall cease to have effect; or

        (ii)    if the Charterers wish to take delivery of the Vessel they may by notice in writing within seven (7) running days require the Owners to negotiate with the Builders as to the terms on which delivery should be taken and/or refrain from exercising their right to rejection and upon receipt of such notice the Owners shall commence such negotiations and/or take delivery of the Vessel from the Builders and deliver her to the Charterers.

        (iii)   in no circumstances shall the Charterers be entitled to reject the Vessel unless the Owners are able to reject the Vessel from the Builders;

24



~~if this Charter terminates under sub-clause (b) or (c) of this Clause, the Owners shall thereafter not be liable to the Charterers for any claim under or arising out of the Charter or its termination.~~

~~Any liquidated damages for delay in delivery under the Building Contract and any costs incurred in pursuing a claim therefore shall accrue to the account of the party stated in Box 41(e) or if not filled in shall be shared equally between the parties.~~

~~3       Guarantee Works~~

~~If not otherwise agreed, the Owners authorise the Charterers to arrange for the guarantee works to be performed in accordance with the building contract terms, and hire to continue during the period of guarantee works.  The Charterers have to advise the Owners about the performance to the extent the Owners may request.~~

~~4       Name of Vessel~~

~~The name of the Vessel shall be mutually agreed between the Owners and the Charterers and the Vessel shall be painted in the colours, display the funnel insignia and fly the house flag as required by the Charterers.~~

~~5       Survey on Redelivery~~

~~The Owners and the Charterers shall appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of re-delivery.~~

~~Without prejudice to Clause 15 (Part II), the Charterers shall bear all survey expenses and all other costs, if any, including the cost of docking and undocking, if required, as well as all repair costs incurred.  The Charterers shall also bear all loss of time spent in connection with any docking and undocking as well as repairs, which shall be paid at the rate of hire per day or pro rata.~~



## "BARECON 2001" STANDARD BAREBOAT CHARTER

### PART IV

### HIRE/PURCHASE AGREEMENT

*(Optional, only to apply if expressly agreed and stated in Box 42)*

~~On expiration of this Charter and provided the Charterers have fulfilled their obligations according to Part I and II as well as Part III, if applicable, it is agreed, that on payment of the final payment of hire as per Clause 11 the Charterers have purchased the Vessel with everything belonging to her and the Vessel is fully paid for.~~

~~*In the following paragraphs the Owners are referred to as the Sellers and the Charterers as the Buyers.*~~

~~The Vessel shall be delivered by the Sellers and taken over by the Buyers on expiration of the Charter.~~

~~The Sellers guarantee that the Vessel, at the time of delivery, is free from all encumbrances and maritime liens or any debts whatsoever other than those arising from anything done or not done by the Buyers or any existing mortgage agreed not to be paid off by the time of delivery. Should any claims, which have been incurred prior to the time of delivery be made against the Vessel, the Sellers hereby undertake to indemnify the Buyers against all consequences of such claims to the extent it can be proved that the Sellers are responsible for such claims. Any taxes, notarial, consular and other charges and expenses connected with the purchase and registration under Buyers' flag, shall be for Buyers' account. Any taxes, consular and other charges and expenses connected with closing of the Sellers' register, shall be for Sellers' account.~~

~~In exchange for payment of the last month's hire instalment the Sellers shall furnish the Buyers with a Bill of Sale duly attested and legalized, together with a certificate setting out the registered encumbrances, if any. On delivery of the Vessel the Sellers shall provide for deletion of the Vessel from the Ship's Register and deliver a certificate of deletion to the Buyers.~~

~~The Sellers shall, at the time of delivery, hand to the Buyers all classification certificates (for hull, engines, anchors, chains, etc.) as well as plans which may be in Sellers' possession.~~

~~The Wireless Installation and Nautical Instruments, unless on hire, shall be included in the sale without any extra payment.~~

~~The Vessel with everything belonging to her shall be at Sellers' risk and expense until she is delivered to the Buyers, subject to the conditions of this Contract and the Vessel with everything belonging to her shall be delivered and taken over as she is at the time of delivery,~~

26



after which the Sellers shall have no responsibility for possible faults or deficiencies of any description.

The Buyers undertake to pay for the repatriation of the Master, officers and other personnel if appointed by the Sellers to the port where the Vessel entered the Bareboat Charter as per Clause 3(Part II) or to pay the equivalent cost for their journey to any other place.

27

# PART V

## PROVISIONS TO APPLY FOR VESSELS REGISTERED IN A BAREBOAT CHARTER REGISTRY

*(Optional, only to apply if expressly agreed and stated in Box 43)*

6 ~~Definitions~~

~~For the purpose of this PART V, the following terms shall have the meanings hereby assigned to them:-~~

~~'The Bareboat Charter Registry' shall mean the registry of the State whose flag the Vessel will fly and in which the Charterers are registered as the bareboat charterers during the period of the Bareboat Charter.~~

~~'The Underlying Registry' shall mean the registry of the State in which the Owners of the Vessel are registered as Owners and to which jurisdiction and control of the Vessel will revert upon termination of the Bareboat Charter Registration.~~

2 ~~Mortgage~~

~~The Vessel chartered under this Charter is financed by a mortgage and the provisions of Clause 12(b) (Part II) shall apply.~~

3 ~~Termination of Charter by Default~~

~~If the Vessel chartered under this Charter is registered in a Bareboat Charter Registry as stated in Box 44, and if the Owners shall default in the payment of any amounts due under the mortgage(s) specified in Box 28, the Charterers shall, if so required by the mortgagee, direct the Owners to re-register the Vessel in the Underlying Registry as shown in Box 45.~~

~~In the event of the Vessel being deleted from the Bareboat Charter Registry as stated in Box 44, due to a default by the Owners in the payment of any amounts due under the mortgage(s), the Charterers shall have the right to terminate this Charter forthwith and without prejudice to any other claim they may have against the Owners under this Charter.~~

~~The terms of this Part V are subject to Clause 36 and the terms of the Finance Documents.~~



SK 27089 0005 1257316 v2

**ADDITIONAL CLAUSES**

**TO "BARECON 2001" STANDARD BAREBOAT CHARTER FOR "MT MARKA"**

In the event of a conflict of conditions, the provisions of these Additional Clause shall prevail over the provisions of Part I, Part II and/or Part IV to the extent of such conflict, but no further.

27.    **Delivery**

      The Charterers shall accept delivery of the Vessel simultaneously with the delivery of the Vessel to the Owners under the MOA.

      The Vessel has been constructed in accordance with the specifications provided to the builder by the Charterers or its affiliates. The Owners make no representation or warranty respecting the Vessel, its condition or specifications. Accordingly, the Vessel, including all classification, inspection, modification and overhaul records, books, records, data, equipment, maintenance logs, certifications, manuals, documentation and other similar information relating to the Vessel, shall be delivered under the Charter **AS IS, WHERE IS** and no preparations, outfitting and/or work shall be carried out by the Owners prior to delivery of the Vessel under the Charter. The Vessel shall be delivered by the Owners to the Charterers on the date the Vessel is delivered by the Sellers to the Owners pursuant to the MOA and the Charterers shall accept such delivery.

      At the time of delivery the Owners and the Charterers shall sign and deliver to each other a protocol of delivery and acceptance confirming the date and the time of delivery and acceptance of the Vessel under the Charter.

      The following provision is applicable to this Charter and any sale of the Vessel hereunder:

      NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE OWNERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE TITLE, SEAWORTHINESS, VALUE, CONDITION, DESIGN, MERCHANTABILITY OR OPERATION OF THE VESSEL, OR AS TO THE QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMANSHIP IN THE VESSEL, OR AS TO THE FITNESS OF THE VESSEL FOR ANY PARTICULAR USE, OR AS TO THE ELIGIBILITY OF THE VESSEL FOR ANY PARTICULAR TRADE OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE VESSEL; AND UNDER NO CIRCUMSTANCES WHATSOEVER SHALL THE OWNERS BE LIABLE OR RESPONSIBLE TO THE CHARTERERS FOR ANY ACTUAL OR CONSEQUENTIAL DAMAGES IN RESPECT OF THE FOREGOING.

      Upon and after such acceptance, the Charterers shall not be entitled to make any claim against the Owners in respect of any conditions, representations and warranties whether express or implied as to the condition and seaworthiness of the Vessel.

19123514 v1

28. **Annual inspection report**

The Charterers shall provide to the Owners at least once per year an inspection report (prepared by the Charterers at their sole expense) showing a fair representation of the condition of the Vessel. Such report shall include photographs of the relevant areas of the Vessel (including but not limited to the engine room, tanks, ballast tanks, deck area and housing area), a written summary from the Technical Managers, and a summary of any conditions of class.

29. **Inventories, oils and stores**

At delivery, the Charterers shall take over all bunkers, lubricating oil, unbroached provisions, paints, ropes and other consumable stores (including spare parts) in the said Vessel at no cost.

30. **Maintenance and operation**

The "good commercial maintenance practice" under Clause 10 above shall be deemed to include:

(a) the maintenance and operation of the Vessel by the Charterers in accordance with:

   (i) the relevant regulations, requirements and recommendations of the classification society so as to maintain the highest class for the Vessel with the classification society;

   (ii) the relevant regulations, requirements and recommendations of the country and flag of the Vessel's registry;

   (iii) IMO regulations;

   (iv) ISM and ISPS code;

   (v) all other applicable regulations, requirements and recommendations;

   (vi) any mortgage on the Vessel; and

   (vii) Charterers' operations and maintenance manuals;

(b) the maintenance and operation of the Vessel by the Charterers taking into account:

   (i) engine manufacturers' recommended maintenance and service schedules; and

   (ii) builder's operations and maintenance manuals; and

(c) recommended maintenance and service schedules of all installed equipment and pipework.

2

31.  **Structural changes and alterations**

   (a)  Except as permitted by Additional Clause 31(b), the Charterers shall make no structural changes to the Vessel or changes in the machinery, engines, boilers, appurtenances or spare parts thereof, except as required for ordinary maintenance or replacements covered by the classification society, without Owners' prior written consent, which consent shall not be unreasonably withheld.

   (b)  Any improvement, structural changes or new equipment becoming necessary for the continued operation of the Vessel by reason of new class requirements or by compulsory legislation shall be for the Charterers' account and the Charterers shall not have any right to recover from the Owners any part of the cost for such improvements, changes or new equipment either during the Charter Period or at redelivery of the Vessel. The Charterers shall give prior written notice to the Owners of any such improvement, structural changes or new equipment.

32.  **Hire**

   (a)  Charter Hire ("Hire") shall commence with effect from the Delivery Date and shall be paid monthly in advance in the amount of Thirteen Thousand Dollars ($13,000) per day on the Delivery Date and on each monthly anniversary thereof (each a "**Hire Payment Date**"). The initial payment of Hire shall be effected by means of an offset to the purchase price under the MOA. Hire shall be paid to such account as directed by the Owners not later than 10:00 am (New York time) on the date on which the relevant payment is due under the terms of this Charter. Notwithstanding the above, should the Charterers fail to redeliver the Vessel within the Charter Period, the Charterers shall pay the daily hire set forth above plus 10 percent, or the then current market rate as determined in accordance the TC1 index published by the Baltic Exchange as the index of rates for Clean Tankers of 75,000mt Naptha Condensate, Middle East Gulf to Japan, whichever is higher, for the number of days by which the Charter Period is exceeded.

   (b)  In the event of any conflict between subclauses 32(b)(i) to (iii) and any other provision of this Charter other than succluase 39(f) with respect to payment of the Termination Amount, the following subclauses 32(b)(i) to (iii) shall prevail:

      (i)  the Charterers shall have no right to be released, relieved or discharged from any obligation or liability under this Charter, for any reason whatsoever, and Charterers acknowledge and agree that their obligations to pay all hire and all other amounts payable to the Owners pursuant to this Charter, is absolute and unconditional and is not subject to any abatement, reduction, set-off, defense, counterclaim or recoupment, and shall not in any other way be affected by, for any reason whatsoever, including without limitation:

         (A)  any act, omission or breach on the part of the Owners or any other Person;

3

(B)     any claims as a result of any other business dealing by the Owners or Charterers;

(C)     any reorganization, arrangement, insolvency, readjustment, bankruptcy, dissolution, liquidation or similar proceeding involving the Owners, the Charterers or any other Person;

(D)     any ineligibility of the Vessel for any particular trade, whether due to any failure or inability of the Owners or the Charterers to comply with any governmental regulation or otherwise;

(E)     any deprivation or limitation of use of the Vessel in any respect or for any length of time, whether or not by reason of some act, omission or breach on the part of the Owners or the Charterers or any other Person, whether or not resulting from requisition of use of the Vessel by any government or governmental body, or any other Person, whether or not resulting from accident and whether or not without fault on the part of the Charterers;

(F)     any damage to or loss or destruction of the Vessel or any part thereof or any interruption or cessation of the possession or use thereof for any reason whatsoever and of whatsoever duration;

(G)     any defect in the condition, seaworthiness, design, operation or fitness for use of, or title to, the Vessel or any Encumbrance on the Vessel;

(H)     any failure on the part of the Owners to perform or comply with any provision of this Charter;

(I)     any ineligibility of the Vessel for documentation under Maltese flag;

(J)     any invalidity, unenforceability or lack of due authorization or other infirmity of this Charter;

(K)     any event of force majeure or any frustration, including any interference with or prohibition of the use of the Vessel by the Charterers;

(L)     any legal requirement; or

(M)     any other reason, including but not limited to, an event of piracy and/or ransom with respect to the Vessel.

The provisions of this Additional Clause 32, and the obligation of the Charterers to pay hire and make any payments under this Charter, shall survive any frustration and that, save as expressly provided in this Charter, no moneys paid under this Charter by

4

the Charterers to the Owners shall in any event or circumstance be repayable to the Charterers.

(ii)    If for any reason whatsoever this Charter shall be terminated in whole or in part by operation of law or otherwise, the Charterers nonetheless, and notwithstanding any other provision of this Charter, agree to pay to the Owners an amount equal to the aggregate of all hire payments, but for the termination of the Charter, through the end of the Charter Period. Such payment shall be final and Charterers shall not seek to recover all or any part of such payment from the Owners for any reason whatsoever.

(iii)    If at any time the law requires (or is interpreted to require) the Charterers to make any deduction or withholding from any payment, or to change the rate or manner in which any required deduction or withholding is made, the Charterers will promptly notify the Owners and, simultaneously with making that payment, will pay to the Owners whatever additional amount (after taking into account any additional taxes on, or deductions or withholdings from, or restrictions or conditions on, that additional amount) is necessary to ensure that, after making the deduction or withholding, the Owners will receive a net sum equal to the full sum which they would otherwise have received had no deduction or withholding been made.

(A)    Within one month after making any tax deduction, the Charterers shall deliver to the Owners documentary evidence satisfactory to the Owners that the tax has been paid to the appropriate taxation authority.

(B)    In this Additional Clause 32, "tax deduction" means any deduction or withholding for or on account of any present or future tax.

(iv)    Owners will make all reasonable efforts to avoid any deductions or withholding.

(c)    All payments under the Charter shall be made to the account of the Owners as provided by the Owners from time to time.

(d)    If any day for the making of any payment under this Charter shall not be a Banking Day the due date for payment of the same shall be the next following Banking Day unless in the case of a payment of Hire under this Charter the next following Banking Day falls in the following calendar month, in which case the due date for the relevant payment of the Hire shall be the immediately preceding Banking Day.

(e)    Any U.S. Gross Transportation Tax as enacted by the United States Public Law 99-514, (also referred to as The U.S. Tax Reform Act of 1986), including later changes or amendments, levied on income attributable to transportation under this charter party which begins or ends in the United States, and which income under the laws of

5

the United States is treated as U.S. source transportation gross income, shall be reimbursed by the Charterers.

**33.   Insurance**

As per Schedule 4 hereto.

34.   **Redelivery**

At the expiration of the Charter Period or upon any other termination of this Charter which results in the return of the Vessel to the Owners, the Charterers shall, unless the Charterers shall have exercised their option to purchase the Vessel pursuant to Additional Clause 52 and have paid the Purchase Option Price thereof, or the Owners have exercised their options to sell the Vessel to the Charterers pursuant to Additional Clause 52, and Charterers have paid the Fifth Anniversary Put Option Price or the Default Put Option Price, as the case may be, at their own cost and expense, redeliver the Vessel to the Owners.  The Vessel shall be re-delivered at a safe, ice free port declared by the Owners where the Vessel would be afloat at all times in a ready safe berth or anchorage in accordance with Clause 15 and Additional Clause 35.

35.   **Delivery and redelivery surveys; Redelivery condition**

The Owners and Charterers shall each appoint (this expense to be for the account of the Charterers) surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at redelivery, which condition shall be in substantially the same condition as the Seller accepted the Vessel from the Builder under the Shipbuilding Contract, and as detailed in the inspection report delivered pursuant to Additional Clause 17(h)(xi) of the MOA, ordinary wear and tear excepted.

In addition to what has been agreed in Clause 15 and Additional Clause 34, upon redelivery Charterers shall redeliver the Vessel, all engines, parts and appurtenances, and all classification, inspection, modification and overhaul records, books, records, data, equipment, maintenance logs, certifications, manuals, documentation and other similar information relating to the Vessel to the Owners in the same good structure, state, conditions and class which she was on the Delivery Date, fair wear and tear excepted. Without limiting the foregoing, the condition of the Vessel upon redelivery shall be as follows:

(a)   the Vessel shall be free of any class and statutory overdue recommendations affecting class;

(b)   the Vessel must be redelivered with all records, logs, plans, operating manuals and drawings, and spare parts;

(c)   the Vessel must be redelivered with all national and international trading certificates and hull/machinery survey positions for both class and statutory surveys free of any overdue recommendation and qualifications valid and un-extended for a period of at least 3 months beyond the redelivery date and with no drydocking due within 6

6

months from the redelivery date; for the avoidance of doubt, the Vessel's initial drydocking for special survey shall be completed prior to redelivery;

(d)     the Vessel must be re-delivered with accommodation and common spaces for crew and officers substantially in the same condition as at the Delivery Date, free of damage over and above fair wear and tear, clean and free of infestation and odors; with cargo spaces generally fit to carry the cargoes originally designed and intended for the Vessel; with main propulsion equipment, auxiliary equipment, cargo handling equipment, navigational equipment, etc., in such operating condition as provided for in this Charter;

(e)     the Vessel shall be free and clear of all Encumbrances other than those created by or on the instructions of the Owners;

(f)     the condition of the cargo holds shall be in accordance with the maintenance regime undertaken by the Charterers during the Charter Period since delivery with allowance for legitimate cargoes carried since the last major maintenance program;

(g)     the antifouling coating system applied at the last scheduled dry-docking shall be in accordance with prevailing regulations at the time of application and commensurate with a 36 month dry docking interval or such other lesser period as may be required by the classification society or flag state;

(h)     the funnel markings and name, unless being maintained by the Owners (with the Charterers' consent) following redelivery shall be painted out by the Charterers;

(i)     recently taken lube oil samples for all major machinery to be made available within one week of redelivery and results forwarded to Owners technical management for review; and

(j)     the Vessel shall be redelivered free of any sub-charter.

The Charterers shall be obliged to repair any class items restricting the trading of the Vessel prior to redelivery.

The Charterers shall be obliged at their sole cost and expense to repair/remedy all such deficiencies as are necessary to put the Vessel into the return condition required by this Additional Clause 35.

36.     **Change of Classification**

The Owners may not change the classification of the Vessel from the classification society specified in Box 10 to any other classification society without the prior written consent of the Charterers.  The Charterers may not change the classification of the Vessel from the classification society specified in Box 10 to any other classification society without the prior written consent of the Owners.

7

37. **Financing / Refinancing**

The Charterers shall comply with the Owners' reasonable requests so as to assist the Owners in maintaining such financing and the Charterers undertake to comply, and provide such information, undertakings, agreements, consents, acknowledgments and other documents to enable the Owners to comply, with all such instructions, directions or requests made by, or assignments of security interests to be made to, the relevant financial institution in connection with such financing. Without limiting the foregoing, the Charterers agree to the following:

(a)     the Charterers shall promptly upon the request of the Owners supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Owners (on behalf of any lender) in order for any lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations, including without limitation the PATRIOT Act; and

(b)     the Charterers undertake to provide such information, undertakings, agreements, consents, acknowledgments and other documents in respect of the employment, insurances, operation, repairs and maintenance of the Vessel as may be directed from time to time during the Charter Period by the relevant financial institution.

Subject to the terms of this Additional Clause 37, the Owners shall, at all times, be entitled to refinance any loan agreement and, at any time after any loan agreement has been repaid,  raise new finance, in each case, with a reputable bank or financial institution. Any refinance of any loan agreement, raising of new finance or material amendment to any loan agreement shall be permitted without the consent of the Charterers provided that in each case any amendment, refinancing or new financing does not impose upon the Charterers greater obligations or liabilities whether financial or any other additional burden than those imposed as a result of the terms of the Senior Financing (as hereinafter defined) and any related security documents. In the event of refinancing all costs associated with it shall be borne by the Owners. The outstanding indebtedness under any new facility shall not be greater than the Purchase Option Price applicable at the time of such refinancing.

Provided the conditions to this Additional Clause 37 are met, at the Owners' reasonable request, the Charterers shall, at no cost to Charterers and provided that the same does not interfere with the operation, possession or management of the Vessel, provide all such documents, perform such acts and provide all assistance required by the Owners to enable at any time a refinancing or restructuring of any loan agreement.

38. **Transport documents**

The Charterers shall use their standard documents, waybills and conditions of carriage in the carriage of goods. Such documents, waybills and standard conditions shall comply with compulsorily applicable legislation.

8

39.  **Termination Events**

(a)  Each of the following events shall constitute a Termination Event:

(i)  **Non payment.** The Charterers or the Charter Guarantor does not pay on the due date any amount payable by them under this Charter or the Charter Guarantee as and when due, **provided that** no Termination Event under this Additional Clause 39(a)(i) will occur if such non payment is due to an administrative or technical error and is remedied within three (3) Business Days of its due date.

(ii)  **Other obligations.** The Charterers or Charter Guarantor do not comply with any provision or covenant of this Charter or the Charter Guarantee (other than as referred to in Additional Clause 39(a)(i) above), including but not limited to any failure to pay the Purchase Option Price on the Purchase Option Date if the Charterers have given notice pursuant to Additional Clause 52 of their intention to exercise their purchase option, **provided that** no Termination Event under this Additional Clause 39(a)(ii) will occur if the failure to comply is capable of remedy and does not relate to the Insurances and is remedied within five (5) Business Days of the Owners giving written notice to the Charterers or the Charterers becoming aware of the failure to comply.

(iii)  **Misrepresentation.** Any representation, warranty or statement made or deemed to be repeated by the Charterers or Charter Guarantor in this (i) Charter or the Charter Guarantee or any other document delivered by or on behalf of the Charterers or Charter Guarantor under or in connection with this Charter, or (ii) in any Senior Financing Security Document, is or proves to have been incorrect or misleading in any material respect when made or deemed to be repeated.

(iv)  **Insolvency**

(A)  Either the Charterers or the Charter Guarantor are unable or admit inability to pay their debts as they fall due, or suspend making payments on any of their debts or shall make a general assignment for the benefit of creditors;

(B)  The value of the assets of either the Charterers or the Charter Guarantor is less than its liabilities (taking into account contingent and prospective liabilities); or

(C)  A moratorium is declared in respect of any Financial Indebtedness of either the Charterers or the Charter Guarantor.

(v)  **Insolvency proceedings.** Any corporate action, legal proceedings or other procedure or step is taken for:

9

(A)  the suspension of payments, a moratorium of any Financial Indebtedness, winding-up, dissolution, administration, bankruptcy or reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise) of either the Charterers or the Charter Guarantor;

(B)  a composition, compromise, assignment or arrangement with any creditor of either the Charterers or the Charter Guarantor;

(C)  the appointment of a liquidator, receiver administrative receiver, administrator, compulsory manager, or trustee or other similar officer in respect of either the Charterers or the Charter Guarantor or any of their assets; or

(D)  enforcement of any Encumbrance over any assets of either the Charterers or the Charter Guarantor,

or any analogous procedure or step is taken in any jurisdiction.

(vi)  **Impossibility or illegality.** Any event occurs which would, or would with the passage of time, render performance of either the Charter or the Charter Guarantee by either the Charterers or the Charter Guarantor or any other party to any such document impossible, unlawful or unenforceable.

(vii)  **Revocation or modification of authorization.** Any consent, license, approval, authorization, filing, registration or other requirement of any governmental, judicial or other public body or authority which is now, or which at any time during the Charter Period becomes, necessary to enable either the Charterers or the Charter Guarantor to comply with any of their obligations under either the Charter or the Charter Guarantee is not obtained, is revoked, suspended, withdrawn or withheld, or is modified in a manner which the Owners consider is, or may be, prejudicial to the interests of the Owners, or ceases to remain in full force and effect.

(viii)  **Curtailment of business.** Either the Charterers or the Charter Guarantor ceases, or threatens to cease, to carry on all or a substantial part of their business or, as a result of intervention by or under the authority of any government, the business of either the Charterers or the Charter Guarantor is wholly or partially curtailed or suspended, or all or a substantial party of the assets or undertaking of either the Charterers or the Charter Guarantor is seized, nationalized, expropriated or compulsorily acquired.

(ix)  **Loss of Vessel.** The Vessel suffers (x) a Major Casualty, and the Vessel has not been repaired in a timely and proper manner, or (y) a Total Loss or is otherwise destroyed, abandoned, confiscated, forfeited or condemned as prize, except that a Total Loss shall not be a Termination Event if:

10

(A)     the Vessel is insured in accordance with the Charter;

(B)     no insurer has refused to meet or has disputed the claim for Total Loss and it is not apparent to the Owners that any such refusal or dispute is likely to occur; or

(C)     payment of all insurance proceeds in respect of the Total Loss is made in full to the Owners within one hundred and twenty (120) days of the occurrence of the casualty giving rise to the Total Loss in question or such longer period as the Owners may in their discretion agree.

(x)     **Challenge to registration.**  The registration of the Vessel is contested or becomes void or voidable or liable to cancellation or termination.

(xi)    **War.**  The country of registration becomes involved in war (whether or not declared) or civil war or is occupied by another power and the Owners in their discretion considers that, as a result, the rights of the Owners under this Charter and Charter Guarantee are materially prejudiced.

(xii)   **Material adverse change.**   In the reasonable opinion of the Owners, a materially adverse change in the financial condition of the Charterers or the Charter Guarantor has occurred such that their ability to satisfy their obligations under this Charter or the Charter Guarantee are, in the reasonable opinion of the Owners, impaired.

(xiii)  [Intentionally Omitted].

(xiv)   **Judgment.**  Any judgment or order for the payment of money individually or in the aggregate in excess of $1,000,000 (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has acknowledged its responsibility to cover such judgment or order) shall be rendered against the Charterer or the Charter Guarantor and such judgment shall not have been vacated or discharged or stayed or bonded pending appeal within 30 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order.

(xv)    **Consents.**  Charterers do not comply with any undertaking set out in any acknowledgement to be given to Owners or Mortgagee pursuant to any notice of assignment served on Owners.

(xvi)   **Charter Guarantee Revoked.**  The Charter Guarantee is terminated, revoked, suspended, withdrawn and/or is otherwise no longer in full force and effect.

(xvii)  **Change of Control.**  There occurs a Change of Control.

11

(xviii) **Change of Financial Position.** Any of the following events occur or any circumstances arise or develop with respect thereto including, without limitation, and, with respect to (xviii) (C) through (F) below, a default has been declared under the Senior Financing, and the Senior Loan has been declared to be due and payable:

(A) any accident or other event involving the Vessel, and the Owners consider that there is a significant risk that either of the Charterers or the Charter Guarantor are, or will later become, unable to discharge their respective liabilities as they fall due; or

(B) there occurs or develops a change in the financial position, state of affairs or prospects of the Charterers or the Charter Guarantor which, in the reasonable opinion of the Owners, has a material adverse effect on the Charterers or the Charter Guarantor's ability to discharge their respective liabilities under or in connection with this Agreement or the Charter Guarantee; or

(C) the Charter Guarantor's Market Adjusted Net Worth is less than US$250,000,000; or

(D) the ratio of the Charter Guarantor's Market Adjusted Net Worth to the Charter Guarantor's Market Adjusted Total Assets is less than 30%; or

(E) the Charter Guarantor holds cash and Marketable Securities of less than US$25,000,000; or

(F) the Charter Guarantor's Current Assets fail to exceed its Current Liabilities (excluding the current portion of long term indebtedness).

(b) A Termination Event shall constitute (as the case may be) either a repudiatory breach of, or breach of condition by the Charterers under, this Charter or an agreed terminating event the occurrence of which will (in any such case) entitle the Owners to exercise all or any of the remedies set out below in this Additional Clause 39.

(c) At any time after a Termination Event shall have occurred and be continuing following the lapse of any applicable grace period as specified in Additional Clause 39(a), the Owners may at their option and by notice in writing to the Charterers (a **"Termination Notice"**) terminate this Charter with immediate effect or on the date specified in the Termination Notice and withdraw the Vessel from the service of the Charterers without noting any protest and without interference by any court or any other formality whatsoever, whereupon the Vessel shall no longer be in the possession of the Charterers with the consent of the Owners, and the Charterers shall redeliver the Vessel to the Owners in accordance with Additional Clauses 34 and 35.

(d) On or at any time after termination of the chartering of the Vessel pursuant to Additional Clause 39(c), the Owners shall be entitled (but not bound and without prejudice to the Charterers' obligations under Additional Clause 35) to (i) retake

12

possession of the Vessel, the Charterers hereby agreeing that the Owners, for that purpose, may put into force and exercise all their rights and entitlements at law and may enter upon any premises belonging to or in the occupation or under the control of the Charterers where the Vessel may be located as well as giving instructions to the Charterers' servants or agents for this purpose, and (ii) change the commercial and technical manager of the Vessel and the flag of the Vessel, in its sole discretion.

(e)     In the event of a termination of the chartering of the Vessel under this Charter in accordance with Additional Clause 39(c), the Charterers shall, on the Termination Payment Date, pay to the Owners the amount calculated in accordance with (f) below.

(f)     On the Termination Payment Date in respect of any termination of the chartering of the Vessel under this Charter in accordance with Additional Clause 39(c) during the Charter Period, the Charterers shall pay to the Owners an amount equal to:

(A)     all hire due and outstanding as at the Termination Payment Date; plus

(B)     an amount equal to the Termination Payment Amount; plus

(C)     any and all costs, including legal fees and expenses incurred in connection with enforcing its rights related to the Termination Event(s).

Upon receipt of the Termination Payment and of any and all other amounts due under this Charter at that time, all right, title and interest in the Vessel shall be transferred by the Owners to the Charterers.

(g)     Save as otherwise expressly provided in this Charter, the Charterers shall not have the right to terminate this Charter any time prior to the expiration of the Charter Period. The rights conferred upon the Owners by the provisions of this Clause 39 are cumulative and in addition to any rights which they may otherwise have in law or in equity or by virtue of the provisions of this Charter.

## 40.    Interest on overdue amounts

Any amounts due under this Charter, whether by acceleration or otherwise, not paid when due, shall bear interest thereafter from the due date thereof until payment at a rate equal to three month LIBOR plus 5.30%.

## 41.    Sub-chartering, assignment and Owners right to sell

(a)     The Charterers shall not without the prior written consent of the Owners:

(i)     let the Vessel on demise charter for any period;

(ii)    de-activate or lay-up the Vessel; or

13

(iii)    assign their rights under this Charter.

(b)    The Charterers shall not enter into any charter or sub-charter with a Prohibited Person.

(c)    The Owners may, at their sole expense, assign all or a part of their rights under this Charter to a Person reasonably acceptable to the Charterers, and the Charterers will grant or execute such consents and acknowledgments in connection therewith as the Owners may request.

42.    **Notices**

Any notices to be given to the Owners under this Charter shall be sent in writing by email, registered letter or facsimile and addressed to:

    Octavian Marka LLC
    c/o Octavian Maritime Holdings, Inc. (as Agent)
    745 Fifth Avenue
    New York, NY 10151

    Attention: Svein Engh

    Facsimile: 212-224-9600
    Email: finance@octavianmaritime.com

or to such other address or facsimile number as the Owners may notify to the Charterers in accordance with this Additional Clause 42.

Any notices to be given to the Charterers under this Charter shall be sent in writing by email, registered letter or facsimile and addressed to:

    Marka Shipping Ltd.
    c/o Genel Denizcilik Nakliyati Asden Line
    Buyukdere Cad. Yapi Kredi Plaza A Blok
    Kat 12 34330 Levent/ Istanbul/ Turkey

    Attention: Mehmet Mat

    Facsimile: 90 212 325 58 14
    Email: finance@gedenlines.com

or to such other address or facsimile number as the Charterers may notify to the Owners in accordance with this Additional Clause 42.

14

Any such notice shall be deemed to have reached the party to whom it was addressed, when dispatched and acknowledged received (in case of a facsimile) or when delivered (in case of a registered letter). A notice or other such communication received on a non-working day or after business hours in the place of receipt shall be deemed to be served on the next following working day in such place.

43.   **No waiver**

No delay, failure or forbearance by a party to exercise (in whole or in part) any right, power or remedy under, or in connection with, this Charter will operate as a waiver. No waiver of any breach of any provision of this Charter will be effective unless that waiver is in writing and signed by the party against whom that waiver is claimed. No waiver of any breach will be, or be deemed to be, a waiver of any other or subsequent breach.

44.   **Entire agreement**

This Charter contains all the understandings and agreements of whatsoever kind and nature existing between the parties in respect of this Charter, the rights, interests, undertakings agreements and obligations of the parties to this Charter and shall supersede all previous and contemporaneous negotiations and agreements.

This Charter may not be amended, altered or modified except by a written instrument executed by each of the parties to this Charter.

45.   **Invalidity**

If any term or provision of this Charter or the application thereof to any Person or circumstances shall to any extent be invalid or unenforceable, the remainder of this Charter or application of such term or provision to Persons or circumstances (other than those as to which it is already invalid or unenforceable) shall (to the extent that such invalidity or unenforceability does not materially affect the operation of this Charter) not be affected thereby and each term and provision of this Charter shall be valid and be enforceable to the fullest extent permitted by law.

46.   **Further assurances and undertakings**

Each party shall make all applications and execute all other documents and do all other acts and things as may be necessary to implement and to carry out its obligations under, and the intent of, this Charter.

The parties shall act in good faith to each other in respect of any dealings or matters under, or in connection with, this Charter.

47.   **No partnership**

Nothing in this Charter creates, constitutes or evidences any partnership, joint venture, agency, trust or employer/employee relationship between the parties, and neither party may

15

make, or allow to be made any representation that any such relationship exists between the parties. Neither party shall have the authority to act for, or incur any obligation on behalf of, the other party, except as expressly provided in this Charter.

48.   **Cumulative rights**

The rights, powers and remedies provided in this Charter are cumulative and not exclusive of any rights, powers or remedies at law or in equity unless specifically otherwise stated.

49.   **Law and Jurisdiction**

(a)    This Charter shall be construed and the relations between the parties determined in accordance with the laws of New York, without reference to conflicts of law principles.

(b)    Each of the Owners and the Charterers hereby irrevocably and unconditionally submit, for themselves and their property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York County, and any appellate court thereof, in any action or proceeding arising out of or relating to this Charter or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State Court or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)    Nothing in this Clause 49 shall affect the right of either party to bring any action or proceeding against the other party or its property in the courts of any other jurisdictions where such action or proceeding may be heard and the other party or its property may be found for jurisdictional purposes.

(d)    Each of the Owners and the Charterers hereby irrevocably and unconditionally waive, to the fullest extent they may legally and effectively do so, any objection which they may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any New York State or Federal court and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any immunity from jurisdiction of any court or from any legal process with respect to themselves or their property.

(e)    The Owners hereby agree to appoint Octavian Maritime Holdings, Inc. (as Agent), with offices currently located at 745 Fifth Avenue, New York, NY 10151, attention: Svein Engh, as its designated agent for service of process for any action or proceeding arising out of or relating to this Charter. The Charterers hereby agree to appoint UM (USA) LLC, with offices currently located at 545 Madison Avenue, 9th Floor, New York, New York 10022, as its designated agent for service of process for any action or proceeding arising out of or relating to this Charter. Each of the

16

Owners and the Charterers also irrevocably consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process to its address specified in Additional Clause 42. Each of the Owners and the Charterers also agree that service of process may be made on them by any other method of service provided for under the applicable laws in effect in the State of New York.

(f) Nothing in this Additional Clause 49 shall exclude or limit any right a party hereto may have (whether under the law of any country, an international convention or otherwise) with regard to the service of process, the recognition or enforcement of a judgment or any similar or related matter in any jurisdiction.

(g) In this Clause 49, **"proceedings"** means proceedings of any kind, including an application for a provisional or protective measure.

(h) THE OWNERS AND THE CHARTERERS MUTUALLY AND IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS CHARTER OR THE TRANSACTIONS CONTEMPLATED HEREBY.

50. **Encumbrances**

Without limiting their obligations under Clause 16, the Charterers shall not permit any Encumbrance against the Vessel other than Encumbrances that arise (a) in the ordinary course of business in connection with the operation of the Vessel or (b) by operation of law, **provided that** any such Encumbrance shall be permitted to exist for not more than 30 days.

51. **Conditions precedent**

The obligation of the Owners to charter the Vessel to the Charterers pursuant to this Charter shall be subject to the condition that the Owners shall have received the following documents and evidence in all respects in form and substance satisfactory to it on or before the Delivery Date:

(a) **Constitutional Documents.** Copies of the constitutional documents of the Charterers and the Charter Guarantor together with such other evidence as the Owners may reasonably require that each of the Charterers and the Charter Guarantor is duly incorporated or formed in their country of incorporation or formation and remain in existence with power to enter into, and perform their obligations under their Charter and the Charter Guarantee.

(b) **Certificates of good standing.** A certificate of good standing in respect of each of the Charterers and the Charter Guarantor.

(c) **Board resolutions.** A copy of the resolutions of the board of directors or its equivalent of each of the Charterers and the Charter Guarantor:

17

<blockquote>
(i)    approving the terms of, and the transactions contemplated by, this Charter and the Charter Guarantee (as the case may be) and resolving that they execute those documents; and

(ii)    authorizing a specified Person or Persons to execute this Charter and the Charter Guarantee (and all documents and notices to be signed and/or dispatched under those documents) on their behalf.
</blockquote>

(d)    **Powers of attorney.** A copy of the power of attorney of each of the Charterers and the Charter Guarantor under which any documents are to be executed or transactions undertaken by each of the Charterers and the Charter Guarantor.

(e)    **Vessel documents.** Photocopies, certified as true, accurate and complete by the sole member or an officer of the Charterers, of:

    (i)    the Management Agreement;

    (ii)    the Vessel's current Safety Construction, Safety Equipment, Safety Radio and Load Line Certificates;

    (iii)    the Vessel's current Certificate of Financial Responsibility issued pursuant to the United States Oil Pollution Act 1990;

    (iv)    the Vessel's current SMC;

    (v)    the ISM Company's current DOC;

    (vi)    the Vessel's current ISSC;

    (vii)    the Vessel's current IAPPC;

    (viii)    the Vessel's current Tonnage Certificate; and

    (ix)    the Charterers current Carrier Initiative Agreement with the United States' Customs Service (if applicable).

(f)    **Confirmation of class.** A Certificate of Confirmation of Class for hull and machinery issued not more than 3 Business Days prior to the delivery of the Vessel under the MOA confirming that the Vessel is classed with the highest class applicable to vessels of her type with American Bureau of Shipping or such other classification society as may be acceptable to the Owners free of recommendations affecting class.

(g)    **Officer's certificates.** A certificate of a duly authorized officer (or in the case of the Charterers, its sole member) of each of the Charterers and the Charter Guarantor certifying that the copy of each document relating to it specified in Additional Clause 51(a), (c) (d) and (e) is complete and in full force and effect as at a date no earlier

18

than the date of this Charter and setting out the names of the sole member and the directors and officers of the Charterers or the Charter Guarantor (as the case may be).

(h)   **Charter Guarantee.**  The Charter Guarantee, in form and substance acceptable to the Owners and the Mortgagee, duly executed and delivered by the Charter Guarantor.

(i)   **Memorandum of Agreement.**  The MOA, in form and substance acceptable to the Owners, duly executed and delivered by all parties thereto.

(j)   **Undertaking regarding commercial and technical management.**  A written undertaking of the Charterers that, throughout the Charter Period unless otherwise agreed by the Owners, the Charter Guarantor or any affiliate thereof will be the commercial and technical managers (the "**Managers**") of the Vessel and that the Charterers will not, without the prior written consent of the Owners, allow the Managers to sub-contract or delegate the commercial or technical management of the Vessel to any third party.

(k)   **Insurance report.**  A favorable report by an independent marine insurance broker designated by the Owners as to the adequacy of the obligatory insurances effected or proposed to be effected pursuant to this Charter.

(l)   **Legal Opinions.**  Favorable opinions, in form, scope and substance satisfactory to the Owners, as to such matters of New York and Maltese law as the Owners or the Mortgagee may request.

(m)   **Process agent.**  Evidence that any process agent appointed under this Charter and the Charter Guarantee has accepted its appointment.

(n)   **No material adverse change.**  There shall have occurred no material adverse change in respect of the business, assets, financial condition or credit worthiness of the Charterers or the Charter Guarantor.

(o)   **Assignment of insurances.**  An assignment of insurances in favor of the Mortgagee, in form and substance acceptable to the Mortgagee, duly executed and delivered by the Charterers.

(p)   **Consent to assignment of Charter and Charter Guarantee.**  A consent and agreement to an assignment by the Owners of the charter and charter guarantee in favor of the Mortgagee, in form and substance acceptable to the Mortgagee, duly executed and delivered by the Charterers and the Charter Guarantor.

(q)   **Manager's undertaking.**  A manager's undertaking in favor of the Mortgagee, in form and substance acceptable to the Mortgagee, duly executed by the Managers and delivered by the Charterers.

19

(r)   **Vessel Valuation.** An appraisal, in form and substance satisfactory to the Owners, of the Fair Market Value of the Vessel showing the Fair Market Value of the Vessel to be not less than the purchase price of the Vessel under the MOA.

(s)   **Representations and Warranties.**   Evidence and or confirmation that the representations and warranties of the Charterers contained in Additional Clause 54 of this Charter (updated mutatis mutandis to such date) being true and correct as if made on and as of the Delivery Date.

(t)   **Fees.** All fees and expenses due and payable to the Purchaser or the Owners under the MOA and/or this Charter shall have been paid.

52.   **Purchase and Sale option**

(a)   Provided that (i) no Termination Event is continuing and/or (ii) the Owners have not terminated the chartering of the Vessel under Additional Clause 39 and/or (iii) the Vessel has not become Total Loss, the Charterers shall from the date falling 1 year after the Delivery Date and on each anniversary of the Delivery Date thereafter (each such date, the "Purchase Option Date") be entitled to exercise an option to purchase (such option being the "Purchase Option") the Vessel on the anniversary dates of the Delivery Date for a purchase amount equal to the aggregate of:

(x)   the amount specified in Schedule 1 which corresponds to the applicable Purchase Option Date (the "Purchase Option Base Price"); and

(y)   an amount equal to thirty percent (30%) of the difference between (a) the fair market value of the Vessel as of the relevant Purchase Option Date (up to a maximum of $44,500,000; and (b) the relevant Purchase Option Base Price. The term "fair market value" as such term is used in this Additional Clause 52 means the charter-free, fair market value of the Vessel on the basis of prompt delivery between a willing buyer and a willing seller in an arms length transaction which shall be the arithmetic mean of two (2) broker valuations, one (1) such broker selected by Owners and one (1) selected by Charterers.

((x) and (y) above collectively referred to as the "Purchase Option Price").

If the Charterers wish to exercise their Purchase Option, the Charterers shall give the Owners irrevocable written notice of such exercise not less than ninety (90) days before the relevant anniversary date. Once exercised, the Purchase Option shall be irrevocable in the case of the Charterers and shall not be withdrawn by the Charterers. Payment of the Purchase Option Price, outstanding interest, any accrued Hire and any other amounts due and owing under this Charter shall be paid prior to Owners' obligation to transfer title to the Vessel from the Owners to the Charterers on the completion date. Upon the occurrence of a Termination Event, the Charterers shall not have the option to exercise their Purchase Option.

Provided (i) the Charterers pay the Purchase Option Price and all other amounts due and owing under this Charter in full on or before the completion date, (ii) the Owners have not terminated the chartering of the Vessel under Additional Clause 39 and (iii)

20

the Vessel has not become a Total Loss, the Owners shall be obliged to deliver to the Charterers, at the Charterers' sole cost and expense, a bill of sale executed and (if required) notarized in respect of the Vessel and to transfer to the Charterers the title which the Owners had in respect of the Vessel, free of the Mortgage on the completion date.

(b)     The Owners will have the option, exercisable on sixty (60) days prior written notice, on the fifth anniversary of the Delivery Date (such date, the "**Fifth Anniversary Put Option Date**") to cause the Charterers to purchase the Vessel for a purchase amount equal to Thirty Seven Million Dollars ($37,000,000) (the "**Fifth Anniversary Put Option Price**").

(c)     The Owners will have the option, exercisable upon demand (the "**Default Put Option Demand Date**"), upon the occurrence of an Event of Default (as such term is defined in the Credit Agreement entered into in connection with the Senior Financing) resulting from the breach by the Charterers of their obligations under this Charter, to cause the Charterers to purchase the Vessel for a purchase price on the date of such demand equal to the Termination Amount corresponding to the date on which such purchase is consummated (the "**Default Put Option Price**").

(d)     IN CONNECTION WITH ANY PURCHASE OR SALE OF THE VESSEL PURSUANT TO THIS ADDITIONAL CLAUSE 52 THE VESSEL SHALL BE TAKEN OVER BY THE CHARTERERS, ON A STRICTLY "AS IS/WHERE IS" BASIS WITHOUT RECOURSE AND, THE OWNERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE SEAWORTHINESS, VALUE, CONDITION, DESIGN, MERCHANTABILITY OR OPERATION OF THE VESSEL, OR AS TO THE QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMANSHIP IN THE VESSEL, OR AS TO THE FITNESS OF THE VESSEL FOR ANY PARTICULAR USE, OR AS TO THE ELIGIBILITY OF THE VESSEL FOR ANY PARTICULAR TRADE, OR AS TO THE VESSEL'S FREEDOM FROM ANY CHARTERS (OTHER THAN CHARTERS TO WHICH THE OWNERS ARE A PARTY) OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE VESSEL AND UNDER NO CIRCUMSTANCES WHATSOEVER SHALL THE OWNERS BE LIABLE OR RESPONSIBLE TO THE CHARTERERS FOR ANY ACTUAL DIRECT OR CONSEQUENTIAL DAMAGES IN RESPECT OF THE FOREGOING.

(e)     If the purchase option referred to above is exercised by the Charterers or either put option referred to above is exercised by the Owners and the Vessel is delivered to the Charterers pursuant thereto, this Charter shall terminate on delivery of the Vessel pursuant thereto and the parties shall thereafter have no claims whatsoever against each other (except for indemnities and other obligations of the Charterers that by their nature should survive the termination or expiry of this Charter including but not limited to those described at Additional Clauses 59 and 60), subject to the Charterers payment in full of the Purchase Option Price, the Fifth Anniversary Put Option Price

21

or the Default Put Option Price, as the case may be, and compliance by the Charterers and the Owners with all their respective obligations hereunder up to and including the date of delivery, including the payment of any sums accrued due and unpaid under this Charter.

(f)     [Intentionally Omitted]

(g)     The Owners disclaim any liabilities in respect of Encumbrances, other than such Encumbrances created by or on the instructions of the Owners.

(h)     In exchange for payment of the Purchase Option Price, the Fifth Anniversary Put Option Price or the Default Put Option Price, as the case my be, (and any amount payable pursuant to sub-paragraph (i) below) the Owners shall furnish the Charterers, at the Charterers' cost and expense, with (i) a Bill of Sale in recordable form in the jurisdiction where the Charterers will register the Vessel, duly attested and/or legalized stating the Vessel to be free of all Encumbrances created by the Owners, (ii) a certified copy of the resolution of the sole manager and member of the Owners authorizing the sale of the Vessel to the Charterers, (iii) a Certificate of Goodstanding in respect of the Owners, (iv) any consent or permission required under Maltese law or any other jurisdiction wherein the Vessel may be registered in connection with the sale of the Vessel by the Owners, (v) a Certificate of Ownership and Encumbrances dated within three (3) days of the date of the Bill of Sale stating that the Vessel is free from recorded Encumbrances, and (vi) any other documents not described herein that may be required from the Owners under Maltese law or another flag state where the Vessel will be registered by the Charterers in connection with their exercise of the purchase option. On delivery the Owners (if requested by the Charterers) shall provide for deletion of the Vessel from the ship's register and deliver a certificate of deletion to the Charterers, at the Charterers' cost and expense.

(i)     In addition to the Purchase Option Price, the Fifth Anniversary Put Option Price or the Default Put Option Price, as the case may be, the Charterers shall pay to the Owners all reasonable legal fees and expenses incurred by the Owners in connection with the exercise thereof.

(j)     If the Charterers fail to give Owners notice of their intention to exercise the purchase option, the Owners shall have the right to market the Vessel to other potential buyers and/or charterers during the last 3 months of the Charter Period, and the Charterers shall permit such potential buyers and/or charterers to inspect the Vessel during the last 3 months of the Charter Period (provided it does not unduly interfere with the commercial operation of the Vessel).

## 53.   Total Loss

(a)     If circumstances exist giving rise to (a) a Total Loss, or (b) an act of piracy with respect to the Vessel, the Charterers shall promptly notify the Owners of the facts of such Total Loss or act of piracy. All insurance payments for such Total Loss shall be paid to the Mortgagee who shall distribute the moneys between themselves, the

22

Owners and the Charterers according to their interests. Without prejudice to the obligations of the Charterers to pay to the Owners all monies then due or thereafter to become due under this Charter, (a) if the Vessel shall become a Total Loss during the Charter Period the Charter Period shall end on the Settlement Date, and (b) the Charterers shall be solely responsible for any ransom payment which might be made by those persons or entities committing the act of piracy..

(b)     If the Vessel becomes a Total Loss during the Charter Period the Charterers shall, on the Settlement Date, pay to the Owners an amount equal to the Termination Payment Amount and any other amounts due under this Charter.

The foregoing obligations of the Charterers under this Clause 53(b) shall apply regardless of whether or not any moneys are payable under any insurances in respect of the Vessel, regardless of the amount payable thereunder, regardless of the cause of the Total Loss and regardless of whether or not any of the said compensation shall become payable; **provided that** all insurance proceeds received by the Owners in relation to the Total Loss shall be applied towards satisfaction of payment of the aggregate amount required by this Additional Clause 53(b) up to such amount.

(c)     The Charterers shall, at the Owners' or the Mortgagee's request, provide satisfactory evidence, in the reasonable opinion of the Owners or the Mortgagee (as the case may be), as to the date on which the constructive total loss of the Vessel occurred pursuant to sub-paragraph (a) of the definition of Total Loss.

(d)     The Charterers shall continue to pay hire on the days and in the amounts required under this Charter notwithstanding that the Vessel shall become a Total Loss, **provided that** no further installments of hire shall become due and payable after the Owners have received the payment required by Clause (b) above.

54.   **Representations and warranties; undertakings and covenants**

(a)     The Owners represent and warrant that:

(i)      on delivery of the Vessel they will have whatever title to the Vessel as has been conveyed to them on such date by the Sellers under the MOA;

(ii)     they are a limited liability company in good standing under Marshall Islands law and have the limited liability company power to purchase the Vessel and to bareboat charter it to the Charterers on the terms hereof; and

(iii)    the execution and delivery of this Charter and the performance of the transactions contemplated herein does not and will not violate any law or regulation and is not in conflict with or inconsistent with or does not constitute a default under (and is in full compliance with) the terms of any law, regulation, indenture, mortgage, deed or trust bond, agreement or other instrument, arrangement or obligation to which the Owners are a party or by which the Owners or any of their assets or properties may be bound or to

23

which the Owners may be subject, including any obligation or regulation imposed by any tax authority to which the Owners may be subject.

(b)    [Intentionally Omitted]

(c)    The Charterers represent and warrant that:

(i)    they are a corporation in good standing under Maltese law and have the limited liability company power to demise charter the Vessel from the Owners on the terms hereof;

(ii)    the execution and delivery of this Charter and the performance of the transactions contemplated herein does not and will not violate any law or regulation and is not in conflict with or inconsistent with or does not constitute a default under (and is in full compliance with) the terms of any law, regulation, indenture, mortgage, deed or trust bond, agreement or other instrument, arrangement or obligation to which the Charterers are a party or by which the Charterers or any of their assets or properties may be bound or to which the Charterers may be subject, including any obligation or regulation imposed by any tax authority to which the Charterers may be subject;

(iii)    all Environmental Permits have been obtained and are in effect for their operations and properties and they have not been notified in writing by any Person that they are potentially liable for the remedial or other costs with respect to treatment, storage, disposal, release, arrangement for disposal or transportation of any Environmentally Sensitive Material, except for costs incurred in the ordinary course of business with respect to treatment, storage, disposal or transportation of such Environmentally Sensitive Material; and

(iv)    the performance by the Charterers of this Charter does not violate any Sanctions.

(d)    The Charterers hereby undertake to the Owners that they will comply in full with the following undertakings throughout the Charter Period:

(i)    they shall maintain their corporate existence as a body corporate duly organized and validly existing under the law of the Malta, and they shall not enter into any mergers and consolidations;

(ii)    at all times keep, and cause the Charter Guarantor to keep, proper books of record and account with respect to the Vessel and otherwise, into which full and correct entries shall be made in accordance with IFRS and otherwise;

(iii)    they shall obtain and promptly renew from time to time all such authorizations, approvals, consents and licenses as may be required under any applicable law or regulation to enable the Charterers to perform their

24

obligations under this Charter, and comply with any contractual obligations related to the Vessel and its operations;

(iv) they shall promptly upon obtaining knowledge thereof, inform the Owners of the occurrence of (a) any default under a material contract (which shall mean contracts or agreements in which the Charterers' or the Charter Guarantor's obligations are in excess of $1,000,000), (b) any litigation or governmental proceeding pending or threatened against the Charterers, the Charter Guarantor or any subsidiaries or affiliates thereof which could reasonably be expected to have a material adverse effect on the business, assets or financial condition of the Charterers or Charter Guarantor, or affect the legality, validity, binding effect or enforceability of this Charter , (c) the withdrawal of the Vessel's rating by its Classification Society or the issuance by the Classification Society of any material recommendation, conditions or notation affecting class, (d) any material event related to the Vessel and its operation, (e) any accident to the Vessel involving repairs the cost whereof will or is likely to exceed $1,000,000 (or the equivalent in any other currency), and (f) any other event or condition which is reasonably likely to have a material adverse effect on the business, assets or financial condition of the Charterers or Charter Guarantor, or affect the legality, validity, binding effect or enforceability of this Charter;

(v) they shall do or cause to be done, all things necessary to comply with all material contracts or agreements, including any relating to the Vessel and its operations. to which they are a party, and all material laws, and the rules and regulations thereunder, applicable thereto, including, without limitation, those laws, rules and regulations relating to employee benefit plans and environmental matters;

(vi) they shall pay all taxes applicable to, or imposed on or in relation to, the Charterers or their business;

(vii) they shall not conduct any business or activity other than the ownership, chartering and operation of the Vessel and activities ancillary thereto;

(viii) except for indebtedness under this Charter they shall not incur or agree to incur or issue any Financial Indebtedness, nor make any commitments, other than those occurring in the ordinary course of trading the vessels or in the ordinary course of running their business;  .

(ix) they shall not engage in any transactions that violates any Sanctions;

(x) they shall maintain the registration of the Vessel under the Maltese flag for the duration of the Charter Period unless the Owners agree otherwise in writing;

25

(xi)    they shall, if and for so long as the Vessel trades in the United States of America Exclusive Economic Zone (as defined in the United States Oil Pollution Act 1990), obtain, retain and provide the Owners with a copy of, a valid Certificate of Financial Responsibility for the Vessel under that Act and will comply strictly with the requirements of that Act;

(xii)    they shall:

    (A)    procure that the Vessel remains for the duration of the Charter Period subject to a SMS;

    (B)    maintain a valid and current SMC for the Vessel throughout the Charter Period and provide a copy to the Owners;

    (C)    procure that the ISM Company maintains a valid and current DOC throughout the Charter Period and provide a copy of the Owners;

    (D)    immediately notify the Owners in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the SMC of the Vessel or of the DOC of the ISM Company; and

    (E)    at all times comply with all relevant international and U.S. conventions, statutes and regulations pertaining to the operation of the Vessel, including but not limited to the ISM Code;

(xiii)    they shall:

    (A)    for the duration of the Charter Period comply with the ISPS Code in relation to the Vessel and procure that the Vessel and the ISPS Company comply with the ISPS Code;

    (B)    maintain a valid and current ISSC for the Vessel throughout the Charter Period and provide a copy to the Owners; and

    (C)    immediately notify the Owners in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the ISSC;

(xiv)    they shall:

    (A)    for the duration of the Charter Period comply with Annex VI in relation to the Vessel and procure that the Vessel's master and crew are familiar with, and that the Vessel complies with, Annex VI;

    (B)    maintain a valid and current IAPPC for the Vessel throughout the Charter Period and provide a copy of the Owners; and

(C)    immediately notify the Owners in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the IAPPC;

(xv)    they shall promptly provide the Owners with any information which they request regarding:

(A)    the Vessel, its employment, position, engagements and its Insurances;

(B)    any expenses incurred, or likely to be incurred, in connection with the operation, maintenance or repair of the Vessel and any payments made in respect of the Vessel;

(C)    any towages and salvages; and

(D)    its compliance, the Managers' compliance and the compliance of the Vessel with the ISM Code and the ISPS Code;

(xvi)    they shall promptly notify the Owners by fax, confirmed forthwith by letter of:

(A)    any occurrence as a result of which the Vessel has become or is, by the passing of time or otherwise, likely to become a Total Loss;

(B)    the occurrence of any Termination Event (or event of which they are aware which, with the giving of notice and/or lapse of time or other applicable condition, would constitute a Termination Event);

(C)    any material requirement or recommendation made by any insurer or classification society or by any competent authority which is not complied with within the time period required for such compliance;

(D)    any arrest or detention of the Vessel, any exercise or purported exercise of any lien on the Vessel or its earnings or any requisition of the Vessel for hire;

(E)    any intended dry docking of the Vessel;

(F)    any Environmental Claim made against the Charterers or in connection with the Vessel, or any Environmental Incident;

(G)    any claim for breach of the ISM Code or the ISPS Code being made against the Charterers, the Managers or otherwise in connection with the Vessel; or

(H)    any other matter, event or incident, actual or threatened, the effect of which will or could lead to the ISM Code or the ISPS Code not being complied with;

27

and the Charterers shall keep the Owners advised in writing on a regular basis and in such detail as the Owners shall require of the Charterers', the Managers' or any other Person's response to any of those events or matters;

(xvii) they shall make available or cause to be made available on a timely basis to the Owners such information as the Owners shall request from time to time in order to enable the Owners to fulfill its and its owner's United States Federal, state, local and non-United States tax return obligations (including, but not limited to:

    (A) summary information prepared on a consistent basis regarding the use and location of the Vessel on voyages between the United States and the farthest point where cargo or passengers are loaded en route to, or discharged en route from, the United States and the manner in which such information has been calculated;

    (B) the number of days, if any, the Vessel spent in United States territorial waters for repair or maintenance; and

    (C) summary information prepared on a consistent basis regarding the amount and jurisdiction to which the Charterers paid taxes imposed on the owner of the Vessel, the rate of such taxes paid and the amount of income subject to tax in such jurisdiction) and shall on a timely basis furnish for inspection and copying such original records or copies of original records necessary to satisfy tax audit requirements and to conduct effectively any tax contest;

(xviii) they shall not trade the Vessel to or from Cuba, Iran, Sudan, Syria, or any country subject to Sanctions;

(xix) they, and they shall ensure that the Charter Guarantor, shall provide the Owners with:

    (1) as soon as possible, but in no event later than one hundred and twenty (120) days after the end of each financial year of the Charter Guarantor, the Charter Guarantor's audited accounts and audited financial statements for such financial year, such accounts and financial statements to be prepared in English in accordance with IFRS consistently applied (each set of accounts and financial statements delivered under this Clause shall be certified by as having been audited by a recognized accounting firm approved by the Owners);

    (2) as soon as possible, but in no event later than sixty (60) days after the end of each quarterly accounts period of the Charter Guarantor. the Charter Guarantor's unaudited financial statements in respect of such quarter to be prepared in English (each set of financial statements

28

delivered under this Clause shall be certified by a director or the Chief Financial Officer of the Charter Guarantor as fairly representing the financial condition and operations of the Charter Guarantor as at the date as at which those financial statements were drawn up), such quarterly reports in respect of the second and fourth quarters of each fiscal year to be accompanied by appraisals of the fair market value of the Vessel from each of two Approved Brokers designated by the Owners; and

(3) any other reports, officer's certificates, or relevant financial or other information reasonably requested by Owners.

(xx) they shall not permit any act, event or circumstance that would result in a Change of Control;

(xxi) they shall ensure that their operations and properties comply with all applicable laws and regulations, including without limitation Environmental Laws, and that they are in compliance in all material respects with all Environmental Permits except to the extent that the failure to so comply could not reasonably be expected to have a material adverse effect on the business, assets or financial condition of the Charterers, or affect the legality, validity, binding effect or enforceability of this Charter; and

(xxii) they shall notify the Owners of the entering into of any time charter of the Vessel with a term in excess of 12 months (a "Long Term Charter"), and execute in favor of the Owners an assignment of such Long Term Charter together with the notices and consents and agreement required thereunder.

## 55. Appointment of Managers

The Owners confirm their consent to the appointment by the Charterers of any of the Managers as the commercial and technical managers of the Vessel.

The Charterers covenant that there shall be no termination of, alteration to, or waiver of any term of, any Management Agreement without the prior consent of the Owners and the Charterers shall not without the prior written consent of the Owners permit any of the Managers to sub-contract or delegate the commercial or technical management of the Vessel to any third party.

In the event the Managers fail to comply with Clause 10 and Additional Clauses 28 and 30 of this Charter, the Charterers shall, upon request by the Owners, terminate the existing Managers and appoint a replacement commercial and technical managers, who shall be managers acceptable to the Owners.

29

56. **Definitions**

In this Charter:

**"Accounting Information"** means the financial statements to be provided by the Guarantor to the Owner in accordance with this Charter or the Charter Guarantee.

**"Accounting Period"** means each consecutive period of approximately 3 months falling during the Charter term (ending on the last day in March, June, September and December of each year) for which Accounting Information is required to be delivered pursuant to this Charter or the Charter Guarantee.

**"Annex VI"** means Annex VI (Regulations for the Prevention of Air Pollution from Ships) to the International Convention for the Prevention of Pollution from Ships 1973 (as modified in 1978 and 1997).

**"Approved Broker"** means any of Allied Shipbrokering, Fearnleys, SSY Valuation Services, Clarkson, Ingenieurbüro Weselmann, Maersk Broker, Barry Rogliano Salles, Cass Maritime Limited or any other broker approved by the Owners and Mortgagee.

**"Business Day"** means a day (other than a Saturday or Sunday) on which banks are open for general business in London, England, New York, New York, Frankfurt, Germany and Curacao, Netherlands Antilles.

**"Change of Control"** means the occurrence of any act, event or circumstance that without prior written consent of the Owners results in (a) the Charter Guarantor owning directly or indirectly less than 100% of the issued and outstanding Equity Interests in the Charterers, or (b) Mehmet Karamehmet owning directly or indirectly less than a controlling interest in of the Charter Guarantor.

**"Charter Guarantee"** means the guarantee executed or to be executed by the Charter Guarantor in favor of the Owners substantially in the form set out in Schedule 3 (or in such other form as the Owners may approve or require).

**"Charter Guarantor"** means Geden Holdings Ltd., a Maltese corporation with offices at 85 St. John's Street, Valletta, Malta.

**"Charter Period"** means the 60 month period specified in Box 21 of this Charter.

**"Current Assets"** of any Person, means all assets of such Person that would, in accordance with IFRS, be classified as current assets on a consolidated balance sheet of a company conducting a business the same as or similar of that of such Person, after deducting adequate reserves in each case in which a reserve is proper in accordance with IFRS.

**"Current Liabilities "**of any Person, means (a) all Indebtedness of such Person and (b) all other items (including taxes accrued as estimated but excluding non-cash obligations under FAS 133) that in accordance with IFRS would be classified as current liabilities on a

30

consolidated balance sheet of such Person (excluding the current portion of the long term debt, pre-delivery financing of the newbuilding vessels)

**"Default Termination"** means a termination of the Charter Period per Additional Clause 39(a)(i) and Additional Clause 39(b).

**"Delivery Date"** means the date of delivery of the Vessel by the Owners to the Charterers under the Charter.

**"DOC"** means, in relation to the ISM Company, a valid Document of Compliance issued for the ISM Company by the Administration under paragraph 13.2 of the ISM Code.

**"Encumbrance"** means a mortgage, charge, assignment, pledge, lien, or other security interest securing any obligation of any Person or any other agreement or arrangement having a similar effect.

**"Environmental Claim"** means:

(a)     any claim which relates to the Vessel or its cargo from time to time by any governmental, judicial or regulatory authority which arises out of an Environmental Incident or an alleged Environmental Incident or which relates to any Environmental Law; or

(b)     any claim by any other Person in relation to the Vessel or its cargo from time to time which relates to an Environmental Incident or to an alleged Environmental Incident;

and "claim" means a claim for damages, compensation, fines, penalties or any other payment of any kind, whether or not similar to the foregoing; an order or direction to take, or not to take, certain action or to desist from or suspend certain action; and any form of enforcement or regulatory action, including the arrest or attachment of any asset.

**"Environmental Incident"** means:

(a)     any release of Environmentally Sensitive Material from the Vessel; or

(b)     any incident in which Environmentally Sensitive Material is released from a vessel other than the Vessel and which involves a collision between the Vessel and such other vessel or some other incident of navigation or operation, in either case, in connection with which the Vessel is actually or potentially liable to be arrested, attached, detained or injuncted and/or the Vessel and/or the Charterers and/or any operator or manager of the Vessel is at fault or allegedly at fault or otherwise liable to any legal or administrative action; or

(c)     any other incident in which Environmentally Sensitive Material is released otherwise than from the Vessel and in connection with which the Vessel is actually or potentially liable to be arrested and/or where the Charterers and/or any operator or manager of the Vessel is at fault or allegedly at fault or otherwise liable to any legal or administrative action.

31

"**Environmental Law**" means any law relating to pollution or protection of the environment, to the carriage of Environmentally Sensitive Material or to actual or threatened releases of Environmentally Sensitive Material.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Environmentally Sensitive Material**" means oil, oil products and any other substance (including any chemical, gas or other hazardous or noxious substance) which is (or is capable of being or becoming) polluting, toxic or hazardous.

"**Equity Interests**" of any Person means:

(a)     any and all shares and other equity interests (including common stock, preferred stock, limited liability company interests and partnership interests) in such Person; and

(b)     all rights to purchase, warrants or options or convertible debt (whether or not currently exercisable), participations or other equivalents of or interests in (however designated) such shares or other interests in such Person.

"**Fair Market Value**" means in respect of the Vessel, the fair market value of the Vessel which shall be conclusively determined on a charter-free basis, with or without physical inspection, on the basis of a sale for prompt delivery on normal arms length terms between a willing buyer and willing seller by Approved Brokers (and in a form approved by the Mortgagee and addressed to the Owners and/or the Mortgagee)

"**Financial Indebtedness**" means any obligation for the payment or repayment of money, whether present or future, actual or contingent, in respect of:

(a)     moneys borrowed;

(b)     any acceptable credit;

(c)     any bond, note, debenture, loan stock or similar instrument;

(d)     any finance or capital lease;

(e)     receivables sold or discounted (other than on an on-recourse basis);

(f)     deferred payments for assets or services;

(g)     any derivative transaction protecting against or benefit from fluctuations in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value shall be taken into account);

32

(h)     any amount raised under any other transaction (including any forward sale or purchase agreement) having the commercial effect of a borrowing;

(i)     any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(j)     the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (i) above.

"**Fleet Market Value**" means the aggregate market value of the Fleet Vessels as determined by the Guarantor on the basis of third party valuations approved by the Owner or the present value of the future cash flows of the Fleet Vessels.

"**Fleet Vessels**" means any vessel (including, but not limited to, the Vessel) from time to time owned by the Guarantor or any wholly-owned subsidiary thereof (each a "Fleet Vessel").

"**IAPPC**" means a valid international air pollution prevention certificate for the Vessel issued under Annex VI.

"**IFRS**" means the international financial reporting standards adopted by the International Accounting Standards Board from time to time in effect.

"**Insurances**" means all policies and contracts of insurance (including all entries in protection and indemnity or war risks associations) which are from time to time taken out or entered into in respect of or in connection with the Vessel or her increased value or for earnings and (where the context permits) all benefits under such contracts and policies, including all claims of any nature and returns of premium.

"**ISM Code**" means the International Management Code for the Safe Operation of Ships and for Pollution Prevention.

"**ISM Company**" means, at any given time, the company responsible for the Vessel's compliance with the ISM Code under paragraph 1.1.2 of the ISM Code.

"**ISPS Code**" means the International Ship and Port Facility Security Code.

"**ISPS Company**" means, at any given time, the company responsible for the Vessel's compliance with the ISPS Code.

"**ISSC**" means a valid international ship security certificate for the Vessel issued under the ISPS Code.

"**LIBOR**" means the "LIBOR" as applicable under the financing obtained by the Owners in connection with the Vessel.

33

"**Major Casualty**" means, in relation to the Vessel, any casualty to the Vessel in respect of which the claim or the aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds $1,000,000 or the equivalent in any other currency.

"**Management Agreement**" means the agreement(s) for the commercial and technical management of the Vessel between the Charterers and the Managers, in form and substance satisfactory to the Owners and the Mortgagee.

"**Managers**" has the meaning given to such term in Additional Clause 51(j).

"**Market Adjusted Net Worth**" means, in respect of an Accounting Period, the amount of the Guarantor's total shareholders' equity, as such equity is reflected in the most recent Accounting Information, adjusted in respect of the Fleet Vessels, by the difference between the Fleet Market Value and the book value of Tangible Fixed Assets..

"**Market Adjusted Total Assets**" means the aggregate at any time of Current Assets and Value Adjusted Long Term Assets .

"**Marketable Securities**" means:

(a)  securities issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof (provided that the full faith and credit of the United States of America is pledged in support thereof);

(b)  time deposits, certificates of deposit or deposits in the interbank market of any commercial bank of recognized standing organized under the laws of the United States of America, any state thereof or any foreign jurisdiction having capital and surplus in excess of $500,000,000; and

(c)  such other securities or instruments as the Owner shall agree in writing;

and in respect of both (a) and (b) above, with a Rating Category of at least "A+" by S&P and "A" by Moody's (or the equivalent used by another Rating Agency) in each case having maturities of not more than ninety (90) days from the date of acquisition;.

"**MOA**" means the Memorandum of Agreement dated the date hereof between the Sellers, as sellers, and the Owners, as buyers, in respect of the Vessel.

"**Operative Documents**" has the meaning given to such term in Additional Clause 59(a).

"**PATRIOT Act**" means the United States Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Improvement and Reauthorization Act of 2005 (H.R. 3199).

"**Person**" means an individual, partnership, corporation (including a business trust), financial institution, limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

34

**"Prohibited Person"** means any Person (whether designated by name or by reason of being included in a class of Persons) against whom Sanctions are directed.

**"Purchase Option Price"** has the meaning given to such term in Additional Clause 52(a).

**"Sanctions"** means any sanctions, embargoes, freezing provisions, prohibitions or other restrictions relating to trading, doing business, investment, exporting, financing or making assets available (or other activities similar to or connected with any of the foregoing):

(a)     imposed by law or regulation of the Council of the European Union, the European Commission, the United Nations or its Security Council or the United Kingdom;

(b)     under the United States Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010;

(c)     in respect of (i) a "national" of any "designated foreign country", within the meaning of the Foreign Assets Control Regulations or the Cuban Asset Control Regulations of the United States Department of the Treasury, 31 C.F.R., Subtitle B, Chapter V, as amended, or (ii) a "specially designated national" listed by OFAC or any regulations or rulings issued thereunder; or

(d)     otherwise imposed by any law or regulation or Executive Order by which the Owners, the Charterers or the Charter Guarantor is bound or, as regards a regulation, compliance with which is reasonable in the ordinary course of business of the Owners, the Charterers or the Charter Guarantor, including without limitation laws or regulations or Executive Orders restricting loans to, investments in, or the export of assets to, foreign countries or entities doing business there;

**provided that** the laws and regulations described in paragraphs (a) and (d) shall be applicable only to the extent such laws and regulations are not inconsistent with the laws and regulations of the United States of America.

**"Sellers"** means Marka Shipping Ltd., a Maltese corporation, that is a subsidiary of the Charter Guarantor.

**"Senior Financing"** shall mean the financing of the Owners' purchase of the Vessel made available to the Owners by Norddeutsche Landesbank Girozentrale(or an affiliate thereof).

**"Senior Financing Security Documents"** shall mean the security and any other documents executed by the Charterers or the Charter Guarantor in connection with the Senior Financing.

**"Senior Loan Amount"** shall mean the outstanding amount of the loan made available to the Owners under the Senior Financing.

**"Settlement Date"** means, following a Total Loss of the Vessel, the earliest of:

35

(a)     the date which falls ninety (90) days after the date of occurrence of the Total Loss or, if such date is not a Business Day, the immediately preceding Business Day; and

(b)     the date on which the Owners receive the Total Loss Proceeds in respect of the Total Loss.

"**SMC**" means a valid safety management certificate issued for the Vessel by or on behalf of the Administration under paragraph 13.7 of the ISM Code.

"**SMS**" means a safety management system for the Vessel developed and implemented in accordance with the ISM Code.

"**Tangible Fixed Assets**" means, in respect of an Accounting Period, the value (less depreciation) on a consolidated basis of all tangible fixed assets of the Corporate Guarantor as stated in the then most recent Accounting Information.

"**Termination**" means the termination at any time of the chartering of the Vessel under this Charter.

"**Termination Event**" means each of the events specified in Additional Clause 39(a) and Additional Clause 39(b).

"**Termination Notice**" shall have the meaning given to such term in Additional Clause 39(c).

"**Termination Payment Amount**" means the aggregate amount of (x) (i) the amount set out for the relevant period of the Charter in the schedule below and (ii) an amount equal to thirty percent (30%) of the difference, by which the fair market value (as defined in Additional Clause 52(a)(y)) of the Vessel (up to a maximum of $44,500,000) exceeds the amount set out for the relevant period in the schedule below, less (y) any unpaid Sellers Loan pursuant to and in accordance with the MOA.

| From the Delivery Date through 11 months | $45,000,000 |
| Months 12 – 23 | $41,800,000 |
| Months 24 - 35 | $40,500,000 |
| Months 36 – 47 | $39,500,000 |
| Months 48 – 59 | $38,500,000 |
| Month 60 | $37,500,000 |

"**Termination Payment Date**" means:

36

    (i)      in respect of a Default Termination, the date specified in the Termination Notice served on the Charterers pursuant to Additional Clause 39(c) of this Charter in respect of such Default Termination; and

    (ii)     in respect of a Total Loss Termination, the Settlement Date in respect of the Total Loss which gives rise to such Total Loss Termination.

**"Total Loss"** means:

(a)    actual, constructive, compromised, agreed or arranged total loss of the Vessel;

(b)    any expropriation, confiscation, requisition or acquisition of the Vessel, whether for full consideration, a consideration less than its proper value, a nominal consideration or without any consideration, which is effected by any government or official authority or by any person or persons claiming to be or to represent a government or official authority (excluding a requisition for hire for a fixed period not exceeding one (1) year without any right to an extension), unless it is within one (1) month redelivered to the full control of the Owners or the Charterers; or

(c)    any arrest, capture, seizure or detention of the Vessel (including any hijacking or theft) unless it is within one (1) month redelivered to the full control of the Owner or the Charterers.

**"Total Loss Termination"** means a termination of the Charter Period pursuant to the provisions of Additional Clause 53(a).

**"Value Adjusted Long Term Assets"** means the aggregate at any time of the Fleet Market Value (as most recently required to be calculated) and the Charter Guarantor's other long term tangible assets as stated in its Accounting Information then most recently required to be delivered pursuant to this Charter or the Charter Guarantee.

All accounting terms used herein but not defined herein shall have the meanings and usages attributable thereto All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with IFRS, applied on a consistent basis, as in effect from time to time and in a manner consistent with that used in preparing its audited financial statements.

57.    **Fees and expenses**

    (a)    The Charterers shall reimburse the Owners in respect of their legal fees and disbursements, including without limitation such fees and disbursements incurred in connection with:

37

(i)     the negotiation, preparation and execution of this Charter, the Charter Guarantee, the MOA and any documentation or reports arising in connection therewith;

(ii)    the delivery of the Vessel under the MOA and this Charter;

(iii)   the registration of the Vessel under Maltese law (the documentation for which shall be the responsibility of the Charterers);

(iv)    any valuation of the Vessel; and

(v)     review of and report on its Insurances.

58.     **Stamp duties and taxes**

The Charterers shall pay promptly all stamp, documentary or other like duties and taxes to which the Charter and the Charter Guarantee (or any of them) may be subject or give rise and shall indemnify the Owners on demand against any and all liabilities with respect to or resulting from any delay on the part of the Charterers to pay such duties or taxes.

59.     **Indemnity**

Whether or not any of the transactions contemplated hereby are consummated, the Charterers shall indemnify, protect, defend and hold harmless the Owners, and their officers, directors, agents and employees (collectively, the **"Indemnitees"**) from, against and in respect of, any and all liabilities (including tax liabilities other than tax on the overall net income of the Owners), obligations, losses, damages, penalties, fines, fees, claims, actions, proceedings, judgment, order or other sanction, lien, salvage, general average, suits, costs, expenses and disbursements, including reasonable legal fees and expenses, of whatsoever kind and nature (herein collectively called **"Expenses"**), imposed on, suffered or incurred by or asserted against any Indemnitee, in any way relating to, resulting from or arising out of or in connection with, in each case, directly or indirectly, any one or more of the following:

(a)     this Charter and any other instrument or agreement entered into by any of the parties hereto in connection with the transactions contemplated hereby (collectively, the **"Operative Documents"**) and any amendment, supplement or modification of or to any of the Operative Documents requested by the Charterers;

(b)     the Vessel or any part, including with respect thereto, (i) the manufacture, design, possession, use or non-use, operation, maintenance, testing, repair, overhaul, condition, alteration, modification, addition, improvement, seaworthiness, replacement, repair of the Vessel or any part (including, in each case, latent or other defects, whether or not discoverable and any claim for patent, trademark, or copyright infringement and all liabilities, obligations, losses, damages and claims in any way relating to or arising out of spillage of cargo or fuel, out of injury to Persons, properties or the environment or strict liability in tort), (ii) any claim or penalty arising out of violations of applicable law by the Charterers, any sub-charterer, (iii)

38

death or property damage of shippers or others, (iv) any liens in respect of the Vessel or any part;

(c)    any breach of or failure to perform or observe, or any other non-compliance with, any covenant or agreement or other obligation to be performed by any of the Charterers under any Operative Document to which it is a party or the falsity of any representation or warranty of any of the Charterers in any Operative Document to which it is a party or the occurrence of any Termination Event;

(d)    in preventing or attempting to prevent the arrest, confiscation, seizure, taking and execution, requisition, impounding, forfeiture or detention of the Vessel, or in securing or attempting to secure the release of the Vessel in connection with the exercise of the rights of a holder of a lien created by the Charterers;

(e)    incurred or suffered by the Owners in recovering possession of the Vessel following termination of this Charter under Additional Clause 39;

(f)    arising from the Master or officers of the Vessel or the Charterers' agents signing bills of lading or other documents; or

(g)    in connection with (i) the arrest, seizure, taking into custody or other detention by any court or other tribunal or by any governmental entity or (ii) subjection to distress by reason of any process, claim, exercise of any rights conferred by a lien or by any other action whatsoever, of the Vessel which are expended, suffered or incurred as a result of or in connection with any claim or against, or liability of, the Charterers or any other member of the Charterers' group, together with any costs and expenses or other outgoings which may be paid or incurred by the Owners in releasing the Vessel from any such arrest, seizure, custody, detention or distress.

**60.**    **Currency Indemnity.**

(a)    If for the purpose of obtaining or enforcing a judgment in any court in any country it becomes necessary to convert into any other currency (the "judgment currency") an amount due in Dollars under this Charter then the conversion shall be made, in the discretion of the Owners, at the rate of exchange prevailing either on the date of termination or on the day before the day on which the judgment is given or the order for enforcement is made, as the case may be (the "conversion date"), provided that the Owners shall not be entitled to recover under this section any amount in the judgment currency which exceeds at the conversion date the amount in Dollars due under this Charter.

(b)    If there is a change in the rate of exchange prevailing between the conversion date and the date of actual payment of the amount due, the Charterers shall pay such additional amounts (if any, but in any event not a lesser amount) as may be necessary to ensure that the amount paid in the judgment currency when converted at the rate of exchange prevailing on the date of payment will produce the amount then due under

this Charter in Dollars; any excess over the amount due received or collected by the Owners shall be remitted to the Charterers.

(c)     Any amount due from the Charterers under this Additional Clause 60 shall be due as a separate debt and shall not be affected by judgment being obtained for any other sums due under or in respect of this Charter.

(d)     The term "rate of exchange" in this Additional Clause 60 means the rate at which the Owners in accordance with their normal practices is able on the relevant date to purchase Dollars with the judgment currency and includes any premium and costs of exchange payable in connection with such purchase.

**61.    Value Maintenance.**

If at any time during the term of this Charter, the Fair Market Value of the Vessel is less than one hundred twenty five percent (125%) of the Senior Loan Amount (such percentage being the "Required Percentage") the Charterers shall, within a period of thirty (30) days following receipt by the Charterers of written notice from the Owners notifying the Charterers of such shortfall and specifying the amount thereof (which amount shall, in the absence of manifest error, be deemed to be conclusive and binding on the Charterers), either (i) deliver to the Owner, upon the Owner's request, such additional collateral as may be satisfactory to the Owners in its sole discretion of sufficient value, when aggregated with the Fair Market Value of the Vessel to restore compliance with the Required Percentage or (ii) pay such additional Hire for the Owner to use to prepay the Senior Loan amount as shall result in the Fair Market Value of the Vessel being not less than the Required Percentage. If additional Hire is paid pursuant to this Clause 61, the Purchase Option, the Fifth Anniversary Put Option or the Default Put Option amounts will be reduced by the amount equal to the future value of the additional Hire payment amount, calculated on the basis of an 11.5% interest rate from the date the additional Hire payment was made to the date of each Purchase Option, Fifth Anniversary Put Option or Default Put Option.

**62.    Confidentiality.**

The parties shall keep the negotiations and contents of this Charter and any information (not commonly known to public domain) that they may have received at any time in relation to the business, strategies or financial affairs of the other party in the strictest confidence. The parties may nevertheless disclose such information when required by the Mortgagee (or any of its affiliates), law, regulatory rules and regulations, governmental authorities or relevant stock exchange or to their professional advisers (including, without limitation, legal, accounting and tax advisers). This confidentiality undertaking shall survive the termination of or expiry of this Charter.

Notwithstanding the aforementioned, the Charterers hereby irrevocably directly authorise the Mortgagee, any of their co-lenders / syndicate members, or its or their assigns to give, divulge and reveal from time to time information and details relating to its accounts, this Charter, the MoA and any other security documents to (i) any relevant authorities, (ii) the Mortgagee's, any facility agent's and any swap provider's (in the context of financing in respect of the Vessel) respective head office, relevant branches, relevant affiliates, shareholders and (iii) any other relevant parties to the abovementioned documentation or any loan agreement between the Mortgagee and the Owners or any security document related thereto; and (iv) any other person, regarding funding, operational arrangement or other

40

transaction in relation thereto, including without limitation, for purposes in connection with any enforcement or assignment or transfers of any of the rights and obligations of the Mortgagee and the Owners shall be held harmless by the Charterers in relation to any disclosure as referred to in this paragraph of Additional Clause 62.

**63.  Obligations of the Owners.**

The obligation of the Owners to make the Vessel available under this Charter is conditional upon the Owners receiving the Senior Financing (the "Senior Financing") on terms and conditions acceptable to the Owners in an amount not less than USD28,700,000 and the full amount of such financing being made available for the purchase of the Vessel on the Delivery Date.  By their execution of this Charter, the Charterers agree to amend any and all terms of this Charter which the Owners determine in their sole discretion are necessary, in order to conform the terms of this Charter with the terms and conditions of the Senior Financing.

41

## SCHEDULE 1
### PURCHASE OPTION BASE PRICE SCHEDULE

| Purchase Option Date | Purchase Option Price |
|---|---|
| 1st Anniversary of the Delivery Date | $41,800,000 |
| 2nd Anniversary of the Delivery Date | $40,500,000 |
| 3rd Anniversary of the Delivery Date | $39,500,000 |
| 4th Anniversary of the Delivery Date | $38,500,000 |
| 5th Anniversary of the Delivery Date | $37,500,000 |

42

## SCHEDULE 2

### TOTAL LOSS MINIMUM INSURED VALUE SCHEDULE

Year 1: $47,250,000
Year 2: $43,890,000
Year 3: $42,525,000
Year 4: $41,475,000
Year 5: $40,425,000

43

## SCHEDULE 3

## FORM OF CHARTER GUARANTEE

44

## SCHEDULE 4

## INSURANCES

**1.1     Maintenance of obligatory insurances.** The Charterers shall keep the Vessel insured at its expense for and against or, in the case of those insurances described in clause (g) below, reimburse to Owners for:

(a)     hull and machinery risks, plus freight interest and hull interest and any other usual marine risks such as excess risks;

(b)     war risks (including the London Blocking and Trapping addendum or similar arrangement);

(c)     full protection and indemnity risks (including liability for oil pollution for an amount of not less than $1,000,000,000 and excess war risk P&I cover) on standard Club Rules, covered by a Protection and Indemnity association which is a member of the International Group of Protection and Indemnity Associations (or, if the International Group ceases to exist, any other leading protection and indemnity association or other leading provider of protection and indemnity insurance) (including, without limitation, the proportion (if any) of any collision liability not covered under the terms of the hull cover), or other with written consent from the Agent;

(d)     freight, demurrage & defense risks;

(e)     risks covered by mortgagee's interest insurance (M.I.I.) (as provided in Clause 1.15 of this Schedule 4 below);

(f)     risks covered by mortgagee's interest additional perils (pollution) (M.A.P.) (as provided in Clause 1.15 of this Schedule 4 below); and

(g)     any other risks against which the Owners or the Mortgagee considers, having regard to practices and other circumstances prevailing at the relevant time, it would in the opinion of the Owners or the Mortgagee be reasonable for the Charterers to insure and which are specified by the Owners by notice to the Charterers (such as, but not limited to, political risks and mortgage rights insurance and piracy coverage).

**1.2     Terms of obligatory insurances.** The Charterers shall affect such insurances in respect of the Vessel:

(a)     in Dollars;

(b)     in the case of the insurances described in (a), (b), (e) and (f) of Clause 1.1 of this Schedule 4 shall each be for at least the greater of:

          (i)      the amounts set forth on Schedule 2; and

          (ii)     the Fair Market Value of the Vessel;

19123514 v1

(c)    in the case of oil pollution liability risks, for an aggregate amount equal to the greater of $1,000,000,000 and the highest level of cover from time to time available under basic protection and indemnity club entry and in the international marine insurance market;

(d)    in relation to protection and indemnity risks in respect of the full tonnage of the Vessel;

(e)    on terms approved by the Mortgagee ("**approved terms**"); and

(f)    through brokers approved by the Mortgagee ("**approved insurance brokers**") and with insurance companies and/or underwriters approved by the Mortgagee ("**approved insurance companies and/or underwriters**") or, in the case of war risks and protection and indemnity risks, in war risks and protection and indemnity risks associations approved by the Mortgagee ("**approved war risks and protection and indemnity risks associations**") that are members of the International Group of P&I Clubs.

**1.3**     **Further protections.** In addition to the terms set out in Clause 1.3 of this Schedule 4, the Charterers shall procure that the obligatory insurances affected by it shall:

    (a)    subject always to paragraph (b) below, name the Owners and the Charterers as the sole named assureds unless the interest of every other named assured is limited:

    (i)    in respect of any obligatory insurances for hull and machinery and war risks;

        (A)    to any provable out-of-pocket expenses that it has incurred and which form part of any recoverable claim on underwriters; and

        (B)    to any third party liability claims where cover for such claims is provided by the policy (and then only in respect of discharge of any claims made against it); and

    (ii)    in respect of any obligatory insurances for protection and indemnity risks, to any recoveries it is entitled to make by way of reimbursement following discharge of any third party liability claims made specifically against it;

and every other named assured has undertaken in writing to the Mortgagee (in such form as it requires) that any deductible shall be apportioned between the Owner, the Charterers and every other named assured in proportion to the aggregate claims made or paid by each of them and that it shall do all things necessary and provide all documents, evidence and information to enable Mortgagee to collect or recover any moneys which at any time become payable in respect of the obligatory insurances;

(b)    whenever the Mortgagee requires, name (or be amended to name) the Mortgagee as additional named assured for its rights and interests, warranted no operational interest and with full waiver of rights of subrogation against the Mortgagee, but without the Mortgagee thereby being liable to pay (but having the right to pay) premiums, calls or other assessments in respect of such insurance;

46

(c)     name the Mortgagee as first priority mortgagee and loss payee with such directions for payment as the Mortgagee may specify;

(d)     provide that all payments by or on behalf of the insurers under the obligatory insurances to the Mortgagee shall be made without set-off, counterclaim or deductions or condition whatsoever;

(e)     provide that the obligatory insurances shall be primary without right of contribution from other insurances which may be carried by the Mortgagee;

(f)     provide that the Mortgagee may make proof of loss if the Owners or the Charterers fails to do so; and

(g)     provide that the deductible of the hull and machinery insurance is not higher that the amount agreed upon and stated in the loss payable clause.

**1.4    Renewal of obligatory insurances.** The Charterers shall:

    (a)     at least 21 days before the expiry of any obligatory insurance:

        (i)     notify the Mortgagee and the Owners of the brokers (or other insurers) and any protection and indemnity or war risks association through or with whom the Charterers proposes to renew that obligatory insurance and of the proposed terms of renewal; and

        (ii)    obtain the Mortgagee's approval to the matters referred to in paragraph (i);

    (b)     at least five (5) days before the expiry of any obligatory insurance, renew that obligatory insurance in accordance with the Mortgagee's approval pursuant to paragraph (a); and

    (c)     procure that the approved insurance brokers and/or the war risks and protection and indemnity associations with which such a renewal is effected shall promptly after the renewal notify the Mortgagee in writing of the terms and conditions of the renewal.

**1.5    Copies of policies; letters of undertaking.** The Charterers shall ensure that all approved insurance brokers provide the Mortgagee with pro forma copies of all policies and cover notes relating to the obligatory insurances which they are to affect or renew and of a letter or letters or undertaking in a form required by the Mortgagee and including undertakings by the approved insurance brokers that:

    (a)     they will have endorsed on each policy, immediately upon issue, a loss payable clause and a notice of assignment in accordance with the requirements of the Insurance Assignment for the Vessel;

    (b)     they will hold such policies, and the benefit of such insurances, to the order of the Mortgagee in accordance with the said loss payable clause;

47

(c)     they will advise the Mortgagee and the Owners immediately of any material change to the terms of the obligatory insurances or if they cease to act as brokers;

(d)     they will notify the Mortgagee and the Owners, not less than 14 days before the expiry of the obligatory insurances, in the event of their not having received notice of renewal instructions from the Charterers or its agents and, in the event of their receiving instructions to renew, they will promptly notify the Mortgagee and the Owners of the terms of the instructions; and

(e)     they will not set off against any sum recoverable in respect of a claim relating to the Vessel under such obligatory insurances any premiums or other amounts due to them or any other Person whether in respect of the Vessel or otherwise, they waive any lien on the policies, or any sums received under them, which they might have in respect of such premiums or other amounts, and they will not cancel such obligatory insurances by reason of non-payment of such premiums or other amounts, and will arrange for a separate policy to be issued in respect of the Vessel forthwith upon being so requested by the Mortgagee.

**1.6     Copies of certificates of entry.**  The Charterers shall ensure that any protection and indemnity and/or war risks associations in which the Vessel is entered provides the Mortgagee with:

(a)     a certified copy of the certificate of entry for the Vessel;

(b)     a letter or letters of undertaking in such form as may be required by the Mortgagee; and

(c)     a certified copy of each certificate of financial responsibility for pollution by oil or other Environmentally Sensitive Material issued by the relevant certifying authority in relation to the Vessel (if applicable).

**1.7     Deposit of original policies.**  The Charterers shall ensure that all policies relating to obligatory insurances are deposited with the approved insurance brokers through which the insurances are effected or renewed.

**1.8     Payment of premiums.**  The Charterers shall punctually pay all premiums or other sums payable in respect of the obligatory insurances and produce all relevant receipts when so required by the Mortgagee.

**1.9     Guarantees.**  The Charterers shall ensure that any guarantees required by a protection and indemnity or war risks association are promptly issued and remain in full force and effect.

**1.10    Compliance with terms of insurances.**  The Charterers shall not do nor omit to do (nor permit to be done or not to be done) any act or thing which would or might render any obligatory Insurance invalid, void, voidable or unenforceable or render any sum payable under an obligatory insurance repayable in whole or in part; and, in particular:

(a)     the Charterers shall take all necessary action and comply with all requirements which may from time to time be applicable to the obligatory insurances, and (without limiting the obligation contained in Clause 1.5(c) of this Schedule 4) ensure that the obligatory insurances are not made subject to any exclusions or qualifications to which the Mortgagee has not given its prior approval;

48

(b)     the Charterers shall not make any changes relating to the classification or classification society or manager or operator of the Vessel unless approved by the underwriters of the obligatory insurances;

(c)     the Charterers shall make (and promptly supply copies to the Owner and the Mortgagee of) all quarterly or other voyage declarations which may be required by the protection and indemnity risks association in which the Vessel is entered to maintain cover for trading to the United States of America and Exclusive Economic Zone (as defined in the United States Oil Pollution Act 1990 or any other applicable legislation); and

(d)     the Charterers shall not employ the Vessel, nor allow it to be employed, otherwise than in conformity with the terms and conditions of the obligatory insurances, without first obtaining the consent of the insurers and complying with any requirements (as to extra premium or otherwise) which the insurers specify.

**1.11    Alteration to terms of insurances.** The Charterers shall neither make nor agree to any alteration to the terms of any obligatory insurance nor waive any right relating to any obligatory insurance.

**1.12    Settlement of claims.** The Charterers shall not settle, compromise or abandon any claim under any obligatory insurance for Total Loss or for a casualty in excess of $1,000,000, and shall do all things necessary and provide all documents, evidence and information to enable the Mortgagee to collect or recover any moneys which at any time become payable in respect of the obligatory insurances.

**1.13    Provision of copies of communications.** Upon specific request of the Mortgagee, the Charterers shall provide the Mortgagee and the Owner, at the time of each such communication, copies of all written communications between the Charterers and:

(a)     the approved insurance brokers;

(b)     the approved protection and indemnity and/or war risks associations;

(c)     the approved insurance companies and/or underwriters, which relate directly or indirectly to:

    (i)      the Charterers' obligations relating to the obligatory insurances including, without limitation, all requisite declarations and payments of additional premiums or calls; and

    (ii)     any credit arrangements made between the Charterers and any of the Persons referred to in paragraphs (a) or (b) relating wholly or partly to the effecting or maintenance of the obligatory insurances; and

(d)     any parties involved in case of a claim under any of insurances relating to the Vessel.

49

1.14    **Provision of information.**  In addition, the Charterers shall promptly provide the Owners (or any Persons which it may designate) with any information which the Owners (or any such designated Person) requests for the purpose of:

(e)    obtaining or preparing any report from an independent marine insurance broker as to the adequacy of the obligatory insurances effected or proposed to be effected; and/or

(f)    effecting, maintaining or renewing any such insurances as are referred to in Clause 1.15 of this Schedule 4 or dealing with or considering any matters relating to any such insurances;

and the Charterers shall, forthwith upon demand, indemnify the Owners in respect of all fees and other expenses incurred by or for the account of the Owners in connection with any such report as is referred to in paragraph (a).

1.15    **Mortgagee's interest, additional perils and political risk insurances.**  The Mortgagee shall be entitled from time to time to effect, maintain and renew (i) mortgagee's interest marine insurance, (ii) mortgagee's interest additional perils insurance and/or (iii) mortgagee's political risks/rights insurance, in such amounts (not to exceed 120% of the loan made available to the Owners by the Mortgagee to finance the Vessel), on such terms, through such insurers and generally in such manner as the Mortgagee may from time to time consider appropriate and the Charterers shall upon demand fully indemnify the Mortgagee in respect of all premiums and other expenses which are incurred in connection with or with a view to effecting, maintaining or renewing any such insurance or dealing with, or considering, any matter arising out of any such insurance.

SK 27089 0005 1257343 v8

# EXHIBIT 3

**Octavian Marka LLC**
**c/o Octavian Maritime Holdings, Inc. (as Agent)**
**745 Fifth Avenue**
**New York, NY 10151**

June 17, 2013

<u>**Via Federal Express, email & fax**</u>
Marka Shipping Ltd.
c/o Genel Denizcilik Nakliyati Asden Line
Buyukdere Cad. Yapi Kredi Plaza A Blok
Kat 12 34330 Levent/ Istanbul/ Turkey
Attention: Mehmet Mat

Facsimile: 90 212 325 58 14
Email: finance@gedenlines.com

Re: Bareboat Charter with Additional Clauses dated April 20, 2012 (the "**Bareboat Charter**") between Octavian Marka LLC, as owners (the "**Owners**"), and Marka Shipping Ltd., as bareboat charterers (the "**Charterers**"), with respect to the demise charter of the Maltese registered MT MARKA (the "**Vessel**") by the Owners to the Charterers (all terms not otherwise defined herein shall have the meaning given thereto in the Bareboat Charter)
<u>**Notice of Charter Termination and Demand for the Termination Payment and the Vessel**</u>

Ladies and Gentlemen:

Pursuant to Additional Clause 32(a) (*Hire*) of the Bareboat Charter, hire is to be paid monthly in advance to the account of the Owners in the amount of US$13,000 per day on each monthly anniversary of the Delivery Date.  On May 28, 2013, a Hire Payment Date, US$403,000 was due and such amount has not been paid to the Owners (the "**May 2013 Payment Default**"). In addition, as shown in Appendix A attached hereto, certain hire to have been paid prior to May 28, 2013 was not paid when due and has not been paid to the Owners (the "**Prior Payment Defaults**" and with the May 2013 Payment Default, the "**Payment Defaults**").  Pursuant to Additional Clause 39(a)(i) (*Non payment*) of the Bareboat Charter, failure to pay on the due date any amounts payable under the Bareboat Charter as and when due shall constitute a Termination Event if such non payment is not due to an administrative or technical error and in that event is not remedied within three Business Days.  **WE HEREBY NOTIFY YOU THAT THE PAYMENT DEFAULTS, AS DISCUSSED ABOVE, EACH CONSTITUTE A TERMINATION EVENT UNDER THE BAREBOAT CHARTER.**

Pursuant to Additional Clause 39(c) of the Bareboat Charter, at any time after a Termination Event shall have occurred and be continuing, the Owners may, at their option and by notice in writing to the Charterers, terminate the Bareboat Charter with immediate effect or on the date specified in the Termination Notice and withdraw the Vessel from the service of the Charterers, whereupon the Vessel shall no longer be in the possession of the Charterers with the consent of the Owners, and the Charterers shall redeliver the Vessel to the Owners in accordance with Additional Clauses 34 and 35 of the Bareboat Charter. **WE HEREBY TERMINATE THE BAREBOAT CHARTER EFFECTIVE IMMEDIATELY** (the "**Termination Date**").

Pursuant to Additional Clause 39(d) of the Bareboat Charter, on or at any time after termination of the chartering of the Vessel pursuant to Additional Clause 39(c) of the Bareboat Charter, the Owners shall be entitled (but not bound and without prejudice to the Charterers' obligations under Additional Clause 35 of the Bareboat Charter) to retake possession of the Vessel, the Charterers thereby agreeing that the Owners, for that purpose, may put into force and exercise all their rights and entitlements at law and may enter upon any premises belonging to or in the occupation or under the control of the Charterers where the Vessel may be located as well as giving instructions to the Charterers' servants or agents for this purpose. **WE HEREBY DEMAND THAT THE CHARTERERS HEREBY REDELIVER THE VESSEL TO THE OWNERS CHARTER FREE AT A SAFE BERTH AT A PORT OF CALL ON THE CARIBBEAN-U.S. GULF RANGE.** Pursuant to a separate letter of instructions we shall advise you of the necessary details attending to the handover of the Vessel to our crew and technical managers and related matters.

Pursuant to Additional Clause 39(f) of the Bareboat Charter, on the Termination Date in respect of any termination of the chartering of the Vessel under the Bareboat Charter in accordance with Additional Clause 39(c) of the Bareboat Charter during the Charter Period, the Charterers shall pay to the Owners an amount equal to:

(A)    all hire due and outstanding as at the Termination Date, including, for the avoidance of doubt, Default Interest (as defined below); plus

(B)    an amount equal to the Termination Payment Amount; plus

(C)    any and all costs, including legal fees and expenses incurred in connection with enforcing the Owners' rights related to the Termination Event(s).

In addition, pursuant to Additional Clause 40 (*Interest on overdue amounts*) of the Bareboat Charter, any amounts due under the Bareboat Charter not paid when due shall bear interest thereafter from the due date thereof until payment at a rate equal to three month LIBOR plus 5.30% ("**Default Interest**").

**WE HEREBY DEMAND THAT THE CHARTERERS IMMEDIATELY REMIT TO THE OWNERS BY IRREVOCABLE AND IMMEDIATE WIRE TRANSFER A PAYMENT IN THE AMOUNT OF US$41,226,550 PLUS DEFAULT INTEREST ON THE OUTSTANDING HIRE AS SET OUT IN (1) BELOW, WHICH SUCH PAYMENT (the "Termination Payment") IS COMPRISED OF:**

2

(1)     US$1,226,550, which represents all hire due and outstanding as at the Termination Date, the calculation of such hire being reflected in Appendix A attached hereto, which amount is subject to Default Interest accruing from the date each such hire payment was due; plus

(2)     US$39,500,000, which represents an amount equal to the Termination Payment Amount, the calculation thereof being reflected in Appendix B attached hereto; plus

(3)     US$500,000, which represents current estimated costs, including estimated legal fees and expenses, incurred in connection with enforcing our rights related to the Termination Events; provided that, we reserve the right to increase this amount if our costs exceed US$500,000.

Further, to the extent the Charterers do not remit the Termination Payment on the date hereof, Default Interest on the Termination Payment shall accrue from the date hereof.

We hereby reserve all of our rights under the Bareboat Charter and the Charter Guarantee. No failure, delay or omission by us in the exercise of any right or power or in our pursuance of any remedy accruing to us upon any breach or default by you shall impair any such right, power or remedy or be construed to be a waiver of any such right, power or remedy or to be an acquiescence therein.


Very truly yours,


OCTAVIAN MARKA LLC
By:  Octavian Maritime Holdings, Inc.,
as sole manager

By: _____
    Name:  Omer Donnerstein

3

Appendix A

## PAYMENT DEFAULTS

The following hire was not paid when due to the Owners on May 28, 2013 and prior and still has not been paid.

| Invoice Date | Invoice Amount | Payment Date | Payment Amount | Outstanding Amount | Cumulative Outstanding |
|---|---|---|---|---|---|
| 11/26/2012 | $390,000 | 1/16/2013 | $253,500 | $136,500 | $136,500 |
| 12/26/2012 | $403,000 | 1/16/2013 | $261,950 | $141,050 | $277,550 |
| 1/28/2013 | $403,000 | 1/16/2013 | $261,950 | $141,050 | $418,600 |
| 2/26/2013 | $364,000 | 2/26/2013 | $236,600 | $127,400 | $546,000 |
| 3/26/2013 | $403,000 | 3/26/2013 | $261,950 | $141,050 | $687,050 |
| 4/26/2013 | $390,000 | 4/26/2013 | $253,500 | $136,500 | $823,550 |
| 5/27/2013 | $403,000 | N/A | N/A | $403,000 | $1,226,550 |

Appendix B

## TERMINATION PAYMENT AMOUNT CALCULATION

Termination Payment Amount of US$39,500,000 as per Additional Clause 39(f) of the Bareboat Charter, such amount being (i) US$41,800,000 (the amount set out for the relevant period of the Bareboat Charter) less (ii) the unpaid Sellers' Loan of US$2,300,000.